512 So.2d 868 (1987)
Cecilia Ann WILLIAMSON, a/k/a Cookie Williamson
v.
STATE of Mississippi.
No. DP-63.
Supreme Court of Mississippi.
August 12, 1987.
*869 Peggy A. Jones, Warren & Jones, Holly Springs, Kenneth J. Rose, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
Cecilia Ann Williamson was indicted and tried for the capital murder of her husband, James Williamson. A jury found her guilty as charged and sentenced her to death. However, because Cecilia Williamson was denied her constitutional right to confront the witnesses presented against her we must reverse and remand the case for a new trial.

*870 FACTS
James Williamson was brutally murdered in his home outside Oakland, Mississippi, sometime during the early morning hours of March 22, 1982. An autopsy revealed that Williamson was shot in the back at close range with a shotgun and died from massive hemorrhaging and shock caused by the wound. The murderer then doused the home with an accelerant and burned it to the ground.
After a lengthy investigation, the Grand Jury of Yalobusha County returned an indictment on January 27, 1983[1] charging Larry Hentz, Owen Lee Harden, and Cecilia Ann Williamson with the capital murder of James Williamson. The indictment was drawn under § 97-3-19(2)(d) of the Mississippi Code Annotated (1972), and charged that Owen Lee Harden actually committed the murder after conspiring with both Hentz and Mrs. Williamson. The State's theory was that the trio conspired to kill James Williamson with Harden and Hentz to be paid for their participation in the crime out of insurance proceeds collected by Mrs. Williamson upon the death of her husband. The trials of the three were ultimately severed with Mrs. Williamson being tried in Pontotoc County after a motion for change of venue was granted.
At trial, neighbors of Williamson testified that they heard vehicles pull up to the home sometime around 4:00 o'clock a.m. on the morning of the murder. Around 6:00 o'clock a.m., the house was discovered on fire and help was summoned. One neighbor, Marty Langston, testified that he saw Mr. Williamson lying in bed while the house was burning but could not get his attention or enter the home to help him due to the heat and smoke. Additional testimony indicated that Williamson had died as a result of a shotgun wound before the house was set on fire.
The State attempted to establish a motive for the murder by introducing evidence that Mrs. Williamson had secured greater insurance coverage on the home and its contents prior to the fire and murder. Nancy Goodwin, a State Farm Insurance Agent from Water Valley, testified that she issued policies equaling a combined total of some $72,500.00 on the home and its contents even though such policies far exceeded the actual value of the property. Goodwin added that Mrs. Williamson turned down her first offer for insurance and persisted until she issued a higher policy claiming that the property was currently uninsured. Goodwin then stated that Williamson called on at least two occasions prior to the fire to be sure that the policies were in effect. Additional testimony from Jim Maclin and Ron Darby indicated that the property was in fact insured at the time Mrs. Williamson bought additional coverage from State Farm. This was one of the reasons why benefits under the policy were denied.
James Williamson's will was introduced into evidence. It provided that Cecilia Ann was to receive all of James' business assets, insurance proceeds, and all other assets upon his death. She was also to receive 192.5 acres of real property upon the death of James' mother.
The State then offered evidence designed to show that Mrs. Williamson and Larry Hentz had engaged in an adulterous relationship prior to the murder. Elizabeth Smith, a desk clerk at the Holiday Inn in Helena, Arkansas, identified Mrs. Williamson and a photograph of Larry Hentz. She testified that the two of them had checked in together on at least one occasion and various registration cards from the hotel were introduced to verify other visits by Mrs. Williamson. Joy Hentz, Larry's mother, testified that Mrs. Williamson moved into her home shortly after the murder and that she and Larry were lovers, often sleeping together in her home and traveling to various location for weekend vacations. She noted that James Williamson's gravel equipment was moved to her home and that Larry began to run the business for Cecilia. Mrs. Hentz also testified that *871 Larry and Cecilia kept in contact by phone after Cecilia moved to Arkansas and later to New Orleans.
The State's three key witnesses were Roger Lynn Hentz, Owen Lee Harden, and Michael Johnson. Roger Lynn Hentz, Larry's younger brother, testified that he was an active participant in the murder and then detailed the events leading up to Williamson's murder.[2] According to Roger Lynn, he, Larry and Owen Lee purchased a gallon of gasoline earlier in the day on March 21, 1982. Later that night, he and Owen Lee Harden traveled from Pope to Grenada and retrieved Bill Morrow's car. Owen Lee also carried a green garbage bag containing a 12 gauge sawed-off shotgun borrowed from Morrow also. They then drove separate vehicles to the Williamson's home where Roger Lynn slammed the car door to distract the dogs before returning to Grenada to await Harden's return. Bill Morrow verified that he lent both his car and the shotgun to Larry Hentz and also testified that he saw Lee Harden return the vehicle to his hotel in Grenada around 6:30 a.m. on March 22, 1982. For their participation in the murder, Roger Lynn testified that Owen Lee Harden was to receive $10,000.00 and that he was to receive $1,000.00.
Roger Lynn testified that he, Larry, and Owen Lee met with Bill Morrow about a week after the murder and described the crime to Morrow. Bill Morrow acknowledged the incident as well. Roger Lynn also testified that in April 1982, the trio decided that Lee Harden should leave town because local authorities had become suspicious regarding the murder. They then went to Joy Hentz' home to see Cecilia Williamson and Larry spoke with Cecilia and then came out and gave Lee Harden eleven one hundred dollar bills to flee the state.
The State's next witness was Owen Lee Harden. Harden had previously been tried on capital murder charges and was acquitted in July 1983. He informed the court that if called to the stand he would invoke his Fifth Amendment privilege against self-incrimination because he was currently under indictment for conspiracy to commit murder and arson which arose out of the Williamson murder. The State dismissed the conspiracy to commit murder indictment and the trial judge ruled that any testimony given by Harden could not be used in a subsequent trial against him and thus compelled him to answer all questions posed by the State.
Nevertheless, Harden invoked his Fifth Amendment privilege to each question asked, including questions regarding an alleged confession he made while incarcerated and awaiting trial. This confession was previously ruled inadmissible at his trial because it was taken in violation of his right to counsel. Harden was held in contempt for each denial. The State was allowed to introduce testimony through David Bryant, Sheriff of Panola County, and Vicky Williams, District Attorney Bobby Williams' wife, and each confirmed that Harden had made a confession regarding the murder and had stated that he killed James Williamson, adding that Cecilia Williamson and Larry Hentz were also involved in the murder. According to Sheriff Bryant and Mrs. Williams, Harden also stated that he had received $1100.00 and was to receive an additional $10,000.00 for the murder after the insurance proceeds were recovered. At the close of the trial, the jury was instructed that the testimony offered by Bryant and Williams was to be viewed only for purposes of impeachment.
Finally, the State called Michael Johnson, a former cell-mate of Larry Hentz. Johnson had previously been arrested on charges of receiving stolen property and consented to serve as an undercover agent in exchange for possible leniency on these charges. Johnson contacted Cecilia Williamson while she was living in Gretna, Louisiana, in January of 1982. He asked for and received money from Mrs. Williamson claiming that he knew all the details surrounding the murder and needed the money to get out of state before the police *872 caught up to him. Additionally, Johnson met with Mrs. Williamson at a hotel in Gretna on at least two occasions and testified that during these sessions Mrs. Williamson offered him $10,000.00 to kill Larry Hentz and her mother-in-law in order to avoid prosecution for the murder of James Williamson. Each of these conversations were recorded and played for the jury over the defendant's objections.
After offering additional witnesses to verify the authenticity of the tape recordings, the State rested and Mrs. Williamson offered no evidence in her defense. The jury deliberated less than an hour before returning a guilty verdict. At the close of the sentencing phase,[3] the jury sentenced Mrs. Williamson to death.

LAW
On appeal to this Court convictions of capital murder and sentences of death must be subjected to what has been labeled "heightened scrutiny." Smith v. State, 499 So.2d 750, 756 (Miss. 1986); West v. State, 485 So.2d 681, 685 (Miss. 1985). Under this method of review, all bona fide doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978); see also, Fisher v. State, 481 So.2d 203, 211 (Miss. 1985) (quoting Irving). With these principles as our guide, we now proceed to review the various propositions presented to us by the defendant.[4]

PROPOSITION I.

DID THE TRIAL COURT ERR IN ALLOWING OWEN LEE HARDEN TO BE CALLED TO THE STAND?
Under this proposition, Williamson first argues that the trial court erred in allowing Harden to be called as a witness with knowledge that he would invoke his Fifth Amendment privilege because it allowed the State to build its case on inferences that the jury may have drawn from Harden's assertion of his rights. We disagree. In Hall v. State, 490 So.2d 858 (Miss. 1986), we recognize that a criminal defendant must be allowed to call witnesses to the stand even though those witnesses intend to invoke their privileges against self-incrimination as secured by the Fifth Amendment. Hall, 490 So.2d at 859. The State should also be afforded the same right. However, as we recognized in Hall, the right to call a witness does not diminish that witness' right to invoke his privilege against self-incrimination. The witness may choose to answer only relevant questions or remain silent if his testimony would subject him to potential prosecution. Hall, 490 So.2d at 859. See Mississippi State Bar v. Attorney L, 511 So.2d 119 (Miss. 1987).
In the present case, Harden was under indictment for conspiracy to commit arson at the time he was called to the stand. The charge of arson was so intertwined to the murder of James Williamson that any testimony given by Harden concerning the murder could have been used in a subsequent trial on those arson charges. Thus, the trial judge erred in compelling Harden to testify in violation of his Fifth Amendment privilege against self-incrimination.
However, were this the only error committed, we would not be required to reverse the conviction. As we noted, the State was not precluded from calling Harden simply because he intended to invoke his privilege against self-incrimination. Further, compelling Harden to testify violated his rights not Williamson's rights. Finally, Harden offered no testimony and instead chose to remain silent on each question. Clearly, had the State only called *873 Harden then Williamson would have no legitimate argument for reversal. However, the State was allowed to call David Bryant and Vicky Williams to testify regarding an alleged confession given by Harden wherein he detailed the events of the murder and implicated Mrs. Williamson as a party to the murder. Williamson now argues that such testimony denied her the right to confront and cross-examine the witnesses presented against her. We agree.
The right of a criminal defendant to confront and cross-examine the witnesses presented against him is secured under both the United States and Mississippi Constitutions. See U.S. Const.Amdt. VI; Miss. Const. Art. III, § 26 (1890). These confrontations clauses "are in a sense hearsay rules elevated to constitutional status" designed to prevent the admission of non-confronted out-of-court statements which lack reliability, are not made under oath, and deny the accused defendant the opportunity to cross-examine such a statement so as to test its truthfulness and reliability. Mitchell v. State, 495 So.2d 5, 8 (Miss. 1986). Confrontation clause problems become even more acute where post-arrest statements made by one of several defendants inculpating one or more of the other defendants is introduced into evidence in proceedings against one of the co-defendants. These accusations are among the least trustworthy of statements, presumptively, though rebuttably, unreliable, and "those most in need of cross-examination under circumstances where the trier of fact had the opportunity to observe the declarant's demeanor." Mitchell, 495 So.2d at 11. Recognition of this problem led the United States Supreme Court to hold that the admission of a co-defendant's extra judicial statement that inculpates the other defendant violates the other defendant's Sixth Amendment right to confront witnesses presented against him, even where the trial court gives a cautionary instruction that such evidence is not to be used substantively. Bruton v. U.S., 391 U.S. 123, 136, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476, 485-86 (1968); see also, Richardson v. Marsh, 481 U.S. ___, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); Cruz v. New York, 481 U.S. ___, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); Lee v. Illinois, 476 U.S. 530, ___-___, 106 S.Ct. 2056, 2063-64, 90 L.Ed.2d 514, 526-9 (1986) (reaffirming Bruton); Mitchell v. State, 495 So.2d 5, 10-11 (Miss. 1986) (following the holdings in Bruton and Lee).
The case at hand differs only slightly from Bruton. In Bruton, the defendants were being tried jointly and statements by one defendant inculpating the other were introduced into evidence. Bruton, 391 U.S. 123, 125, 88 S.Ct. 1620, 1621, 20 L.Ed.2d 476, 478 (1968). In Williamson's case, she and Harden were tried separately. However, such a distinction is minor when one considers the impact of the testimony offered through Sheriff Bryant and Mrs. Williams. This testimony detailed an alleged confession given by Harden while he was incarcerated which clearly implicated Mrs. Williamson as a participant in the murder. They were post-arrest oral statements made without the presence of Harden's counsel and were not made under oath. Further, Harden consistently invoked his Fifth Amendment privilege against self-incrimination and refused to answer any questions regarding the confession. Thus, Williamson was effectively prevented from conducting a meaningful cross-examination of the declarant (Harden) in violation of her constitutionally protected rights. Although Williamson was permitted to cross-examine both Bryant and Williams concerning the circumstances under which the confession was given, this can hardly be said to constitute a substitute for a meaningful cross-examination of the declarant himself. In short, the admission of this testimony denied Williamson her constitutional right to confront and cross-examine the witnesses presented against her.
Nevertheless, the State attempts to persuade us that this evidence was properly admitted to impeach the testimony given by Harden. In both their brief and at oral argument, the State points to the following exchange during the direct examination of Harden:
BY MR. WILLIAMS:

*874 Q. State your name.
A. Lee Harden.
Q. Did you kill James Williamson?
A. At this time a Jury has already found  decided that, and other than that I take the Fifth Amendment.
From this, the State argues that Harden's response opened the door to the introduction of the testimony offered by Sheriff Bryant and Mrs. Williams for the purposes of impeaching his credibility.
The State's argument can be summed up in a word  wrong. When Harden stated that a jury had previously decided whether he had killed James Williamson, that statement was accurate and truthful. He had previously been acquitted at his trial on the capital murder charges stemming from the murder of James Williamson. Apparently then the State was attempting to impeach the truth. We know of no authority and doubt whether any can be found wherein truthful statements are held to be impeachable. Further, Harden's assertion of his privilege against self-incrimination concerning the alleged confession did not constitute a denial by silence as to whether the confession was ever made. Harden simply refused to answer these questions in fear that his statement might incriminate him in future proceedings. He made neither a denial nor an admission and such responses were not the proper subject for impeachment.
Finally, the State contends that even if the statements were improperly admitted, the trial judge cured any prejudicial effect by instructing the jury at the close of the trial that the testimony of Sheriff Bryant and Mrs. Williams was to be viewed for impeachment purposes only. Again, the State fails to recognize the importance of this testimony and the limited effectiveness of cautionary instructions like those given in the present case. Addressing an identical argument, the United States Supreme Court noted, "There are some context in which the risks that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. U.S., 391 U.S. at 135-136, 88 S.Ct. at 1627, 20 L.Ed.2d at 485 (1968). In light of this, the court held that limiting instructions did not constitute an adequate substitute for the defendant's constitutional right to cross-examine the witnesses presented against him and that it was error to admit such testimony. Bruton v. U.S., 391 U.S. at 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.
The same can be said for the case presented to us today. Undeniably, the testimony of Bryant and Williams implicated the defendant as a participant in the plan to murder James Williamson. Until this point, the evidence offered by the State was almost purely circumstantial. This testimony became an essential part of the State's case in chief and Williamson's ability to cross-examine the declarant (Harden) became of even greater significance. An instruction to the jury that the testimony was to be viewed only for impeachment purposes did nothing to diminish the importance of this testimony and certainly did not cure the constitutional error.
Finally, the State argues that the Bruton rule does not require per se reversal if the State presents proof to guarantee the reliability of the statement made by the co-defendant so as to meet the confrontation clause standards. See Lee v. Illinois, 476 U.S. at ___, 106 S.Ct. at 2064, 90 L.Ed.2d at 528 (1986). While the State correctly cites the holding in Lee, their application of that holding to the present case is misplaced. Before a confession of a co-defendant may be introduced as substantive evidence against the other defendant the State must show that each defendant gave a confession that substantially interlocks on the core facts of the crime for which they have been charged. Lee, 476 U.S. at ___, 106 S.Ct. at 2064, 90 L.Ed.2d at 528. In the present case, Mrs. Williamson never gave any confession. In fact, she consistently denied knowledge of and participation in the murder. The requirements created in Lee have not been met and the testimony could not have come in as substantive evidence either.
*875 In summation, we hold that the introduction of the testimony of Sheriff Bryant and Mrs. Williams was reversible error because it denied the defendant her constitutionally protected right to confront and cross-examine witnesses presented against her. This testimony could not have been used either substantively or for impeachment purposes and upon retrial should not be allowed into evidence for any purpose.

PROPOSITION II.

DID THE TRIAL COURT ERR IN ARRAIGNING WILLIAMSON WITHOUT THE PRESENCE OF COUNSEL?
Although as we explained above, we reverse, several matters raised by Mrs. Williamson require our attention and we will now proceed to discuss those matters.
Mrs. Williamson was formerly arraigned on April 13, 1983, before the Circuit Court of Yalobusha County without the assistance of counsel. At the court's direction she entered a plea of not guilty. She now claims that this proceeding was conducted in violation of her federal and state constitutional right to counsel. We find her arguments on this point unpersuasive.
Under both the United States and Mississippi Constitutions, an accused is entitled to the assistance of counsel during criminal proceedings instituted against him. See U.S. Const.Admt. VI; Miss.Const. Art. III, § 26 (1890). These rights are identical and differ only as to the time when each attaches.
The right to counsel secured by the Sixth Amendment to the Constitution of the United States attaches after the initiation of the judicial criminal proceedings, i.e., whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); Moore v. Illinois, 434 U.S. 220, 226-27, 98 S.Ct. 458, 463-64, 54 L.Ed.2d 424, 432 (1977). However, whether the presence of counsel is required at any pretrial proceeding, including arraignment, involves a determination of whether the proceeding is "critical stage" where "the accused is confronted, just as at trial, by the procedural system or by his expert adversary, or by both" such that the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality. U.S. v. Gouveia, 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). To determine whether any pretrial proceeding is critical, the confrontation of the accused must be scrutinized:
... to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.
U.S. v. Wade, 388 U.S. at 227, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157 (1967).
If this test is met, presence of counsel is required "to protect the fairness of the trial itself." U.S. v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).
Applying this test to the present case, we hold that the arraignment as presently practiced in this state does not constitute a critical stage whereby the presence of counsel would be required under the Sixth Amendment of the United States Constitution. The arraignment proceeding in question simply serves to inform the accused as to what charges are pending against him. The indictment is read and the accused enters a plea or a plea is entered for him. Even if the defendant pleads guilty, this plea may later be withdrawn and will be inadmissible at a subsequent trial on those charges. See Uni. Crim.R. of Cir.Ct. 3.01 & 3.03(4) and (6); Miss.R.Ev. 410, effective January 1, 1986; and Sanders v. State, 435 So.2d 1177 (Miss. 1983). These proceedings do not force the accused to plead all available defenses and does not cause him to sacrifice any substantive rights. Cf., Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 1114 (1961) (Alabama arraignment proceedings *876 held critical because accused required to plead all available defenses or waive them thus absence of counsel denied accused substantive rights). No substantial prejudice results to defendant under Mississippi's arraignment proceedings and thus the proceeding is not a critical stage requiring the presence of counsel in order to satisfy the requirements of the Sixth Amendment of the United States Constitution.
The same analysis disposes of Williamson's separate and distinct claim to counsel as secured under the Mississippi Constitution. One's right to counsel under Mississippi law attaches earlier in the day than does the federal right. Page v. State, 495 So.2d 436, 439 (Miss. 1986); that right attaches once the proceedings against the defendant reach the accusatory stage. Page, 495 So.2d at 439; see also, Cannaday v. State, 455 So.2d 713 (Miss. 1984); and Unif.Crim.R. of Cir.Ct. 1.04 and 1.05. Even so, the defendant must show some adverse effect upon his or her ability to conduct a defense before denial of the right constitutes reversible error.
Clearly Williamson's right to counsel had attached under our State Constitution at the time of her arraignment. She had been arrested and was incarcerated prior to arraignment. However, as we noted above, arraignment without counsel did not severely prejudice Williamson's right to a fair trial. Under these facts, we hold that no reversible error occurred here. However, we caution both circuit judges and prosecutors across the state that under our holdings in Page and Cannaday, it is clear that the right to counsel normally attaches prior to arraignment and counsel should be present during arraignment. See also, Rules 1.04 and 1.05, supra.

PROPOSITION III.

WHETHER WILLIAMSON WAS DENIED HER CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL OR WAS SHE TRIED IN VIOLATION OF THE 270-DAY RULE?
Williamson was formally indicted on January 27, 1983, but was not tried until January 16, 1984, a 354 day delay. She now claims that this lengthy delay violated her right to a speedy trial and violated Mississippi's 270 day rule.
The constitutional right to a speedy trial attaches, "at the time of formal indictment or information or actual restraints imposed by arrest and holding to a criminal charge." Bailey v. State, 463 So.2d 1059 (Miss. 1985). Once this right attaches, this Court must apply the following factors to determine whether the accused has been denied his constitutional right:
1. Length of delay,
2. Reason for delay,
3. Defendant's assertion of his right to a speedy trial, and
4. Prejudice resulting to the defendant.
See Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). This test is to be applied on a case by case basis with no one factor being dispositive, rather each must be considered together. Beavers v. State, 498 So.2d 788, 790 (Miss. 1986); Kinzey v. State, 498 So.2d 814, 816 (Miss. 1986).
In the present case, the length of delay between the indictment and the trial was 354 days, a substantial delay. However, at least 74 days of the delay resulted from Williamson's efforts to stop extradiction from Louisiana where she was initially arrested. If the accused caused the delay, he may not thereafter complain. Perry v. State, 419 So.2d 194, 199 (Miss. 1982). This initial 74 day period must be charged to Williamson.
Additionally, the State points out that due to the congested dockets of the Yalobusha Circuit Court there was not another suitable date for trial. In Bailey v. State, 463 So.2d 1059 (Miss. 1985), we noted that where the prosecution causes delay unintentionally and the reason for the delay is overcrowded dockets or understaffed prosecutors, this factor will not be weighed as heavily against the State as where the delay was intended to injure the defendant's case. Bailey, 463 So.2d at 1063; see also, Kinzey v. State, 498 So.2d 814, 816-17 (Miss. 1986) (congested docket constitutes *877 good cause for delay under certain circumstances).
The record before us reflects that the July docket of the Circuit Court of Yalobusha County was previously filled with other cases, including the trial of Williamson's co-indictee Owen Lee Harden. The court normally meets in two terms, July and January, and Williamson's trial was set for the first available date in January. Further, there is no evidence before us that the State intentionally delayed the trial. In this light, it would appear that the delay was due to good cause, although the excuse offered by the State must still be weighed against them.
The third factor concerns Williamson's assertion of her right to a speedy trial. Although she claims to have made such an assertion at a habeas corpus proceeding in August of 1983, the record contains no transcript of this proceeding or other notation concerning this claimed assertion. The only time Williamson raised her claim to a speedy trial according to the record before us was in a motion to dismiss and quash the indictment filed on December 7, 1983, a little over a month before her trial. Finally, Williamson does not claim any resulting prejudice such as loss of evidence or the disappearance of witnesses. Rather, she simply argues that she was continually incarcerated until trial and as a result was prejudiced. Assuredly, her incarceration resulted in some prejudice. However, this is not the type of prejudice which would normally require reversal.
Balancing the factors of Barker with the facts of this case, we conclude that Williamson was not denied her constitutional right to a speedy trial. Although the delay was lengthy, there were numerous reasons for the delay, including the defendant's efforts to fight extradiction and congested court dockets. Further, Williamson did not assert a right to a speedy trial until a little over a month before trial and has failed to show any prejudice other than her continuous incarceration. We find this assignment of error to be without merit.
Williamson also claims the state violated the 270-day rule because she was formally arraigned on April 18, 1983, but her trial was not held until January 16, 1984, a period of 278 days. Section 99-17-1, Mississippi Code Annotated (Supp. 1984), provides that an accused criminal defendant must be tried within 270 days of arraignment, absent a showing of good cause and a continuance duly granted in the case. The statute has been interpreted as being clear and unambiguous. Lightsey v. State, 493 So.2d 375 (Miss. 1986). Where the accused is not tried within 270 days of his arraignment, the state has the burden of establishing good cause for the delay since the accused is under no duty to bring himself to trial. Nations v. State, 481 So.2d 760 (Miss. 1985).
Turning to the instant case, we are of the opinion that the State has met its burden. The primary reason for delay in this case was congested dockets. The Circuit Court of Yalobusha met only in July and January and the July term was previously filled. The trial judge acted in response to this by scheduling Williamson's trial for the first available date at the next term. Under these particular facts, we hold that good cause has been shown. However, we do not wish to imply that congested dockets will in every case constitute good cause for delay under the 270 day rule. Because of this, we limit our ruling today to these particular facts.

PROPOSITION IV.

DID THE TRIAL COURT ERR IN ADMITTING THE RECORDED STATEMENTS OF THE DEFENDANT TAKEN DURING CONVERSATIONS WITH MICHAEL JOHNSON?
As noted earlier, Michael Johnson was employed as an undercover agent for the State and approached Mrs. Williamson prior to her indictment. These conversations were recorded with Johnson's consent and played before the jury at Williamson's trial. On appeal, she cites various reasons why these tapes should not be admitted. Initially Williamson claims that the statements were taken in violation of her right to counsel. However, Mrs. Williamson *878 fails to note that these conversations were recorded prior to her being indicted or placed under arrest. In Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 88 L.Ed.2d 410 (1981), the United States Supreme Court recognized that the Sixth Amendment "by its very nature ... becomes applicable only when the government's role shifts from investigation to accusation." Moran, 475 U.S. at ___, 106 S.Ct. at 1146-7, 89 L.Ed.2d at 427 (1981). This Court as well has distinguished cases where statements elicited from the accused came during the investigatory stages. See Page v. State, 495 So.2d 436, 441 (Miss. 1986); Lee v. State, 489 So.2d 1382 (Miss. 1986).
There can be no doubt that the tapes in this case were recorded during the investigatory stage. Williamson was neither under indictment, nor arrest, nor had an arrest warrant been issued. Her claim that the statements were taken in violation of her right to counsel lacks merit because the proceedings had not gone beyond the investigatory stage.
Additionally, Williamson argues that the tapes were inadmissible because they contained references to other crimes, for which she was not tried, namely conspiracy to commit murder. However, since Michael Johnson was acting as a police informer when he allegedly conspired to commit murder, he was not eligible for co-conspirator's status and thus no crime was committed. See James v. State, 481 So.2d 805, 809 (Miss. 1985). Accordingly, this alleged error also lacks merit.
Finally, Williamson argues that because the tapes were subject to erasure or deletion and because they were partially inaudible, they should have not been admitted into evidence. Before tape recordings are admissible, there must be a showing of genuineness and authenticity of the recording, including a showing that there were no changes or deletions. Haynes v. Avco Security Corp., 299 So.2d 198, 201 (Miss. 1974). The evidence reflects that the tapes in question were both genuine and authentic recordings of the conversations. Although one tape contained a deletion, this deletion was made upon court order when the tapes were introduced at the trial of Larry Hentz, one of Williamson's co-indictee's. The erasure in question concerns statements regarding crimes allegedly committed by Hentz but crimes for which he was not being tried for at the time they were introduced into evidence. Outside of this, there is absolutely no evidence to show that the tapes were altered. One tape did break during the course of the trial but this appears to be due to the age of the tape itself rather than any alteration by outside forces. Additionally, allowing the officers who recorded the tapes to testify as to their content did not deny Mrs. Williamson the right to cross-examine these witnesses as she has claimed in this appeal. Although the officers were not present when the tapes were played before the jury, Williamson was allowed to cross-examine each witness regarding his testimony as to the contents of the tape and in this way was afforded an opportunity to show the jury any inaccuracies between the actual tapes and the officer's recollection of the conversation. See Phillips v. State, 374 So.2d 824 (Miss. 1979). Again, we find that no reversible error occured when the trial judge allowed the tapes to be played before the jury and thus find Mrs. Williamson's argument to lack merit.

PROPOSITION V.

DID THE TRIAL COURT ERR IN ADMITTING THE TESTIMONY OF ROGER LYNN HENTZ UNDER THE CONSPIRACY EXCEPTION TO THE HEARSAY RULE?
At trial, Roger Lynn Hentz was allowed to detail the events leading up to the murder of James Williamson over the objection of the defense. The trial judge found that the State had established a conspiracy to commit murder of which Mrs. Williamson was a co-conspirator and allowed the testimony to be admitted as statements made during the course and in furtherance of the conspiracy. We agree with this ruling.
In Peoples v. State, 501 So.2d 424 (Miss. 1987), we again recognized that among co-conspirators there must be a recognition *879 that they are entering into a common plan knowingly intending to further its common purpose. There need not be a formal or express agreement and the existence of any such agreement necessarily may be inferred from the circumstances, particularly the declarations, acts, and conduct of the alleged conspirator. Mere association with a conspirator is not enough  "there must exist some evidence that the defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his actions to make it succeed." Peoples, 501 So.2d at 428. One conspirator need not be aware of all the details of the conspiracy in order to be found to have agreed to participate in the conspiracy. U.S. v. Riccobene, 709 F.2d 214, cert. denied, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 514 (3rd Cir.1983); U.S. v. Jannotti, 729 F.2d 213 (5th Cir.1984). Once a conspiracy is established co-conspirators statements made in the course of and in furtherance of the conspiracy are admissible against each conspirator, notwithstanding the confrontation clause or hearsay rule. Mitchell v. State, 495 So.2d 5, 11 (Miss. 1986); see also, Miss.R.Evi. 801(d)(2)(E).
Although the bulk of evidence relied on by the State is circumstantial, we nevertheless find that the evidence was sufficient to establish a conspiracy to murder James Williamson of which Cecilia Williamson was a co-conspirator. Unquestionably, the most crucial evidence concerned Williamson's conduct prior to the murder. The evidence reflects that she:
(1) engaged in an adulterous affair with Larry Hentz prior to and after the murder;
(2) overinsured the contents of her home relying on false information to obtain the policy and constantly checked to see if the policy was in effect prior to the murder;
(3) was associated with Roger Lynn and Owen Lee Harden;
(4) was absent from her home the night of the murder; and
(5) was the beneficiary under all the victim's insurance policies and his will.
This evidence was sufficient to allow the trial judge to determine that there was in fact a conspiracy. The mere fact that Mrs. Williamson may not have known that Roger Lynn was also participating does not preclude a finding that she agreed to and participated in such a conspiracy. Based on this finding, we hold that the testimony of Roger Lynn Hentz concerning the events leading up to the murder were properly admitted. Further, additional testimony offered by Hentz regarding efforts to cover up the murder by sending Owen Lee Harden to North Carolina were also admissible. Clearly, one of the objectives of any conspiracy is to avoid arrest and prosecution. Statements made after the completed act pertaining to a coverup of that act would also be admissible under this exception to the hearsay rule.
However, a more troublesome question concerns certain other statements made after the completion of the murder but not pertaining to any effort to cover up the crime. Particularly, we note that certain testimony was introduced through Roger Lynn Hentz, Bill Morrow and Bobby J. Tutor, concerning descriptions of the murder long after it had occurred.
In U.S. v. Phillips, 664 F.2d 971 (5th Cir.1981), the Fifth Circuit Court of Appeals held that retrospective statements describing past events not made in the furtherance of the conspiracy constituted mere idle conversation between co-conspirators which was not admissible under Rule 801(d)(2)(E), of the Federal Rules of Evidence. Phillips, 664 F.2d at 1027; see also, U.S. v. James, 510 F.2d 546, 549 (5th Cir.1975) (same); U.S. v. Lieberman, 637 F.2d 95, 102-03 (2nd Cir.1980). While it is true that these cases interpret 801(d)(2)(E) of the Federal Rules of Evidence, Mississippi's previous case law recognized that co-conspirators' statements could only be admitted if they were made during the course of and in furtherance of the conspiracy, a requirement identical to that found in the Federal Rules of Evidence. See Mitchell v. State, 495 So.2d 5, 11 (Miss. 1986). Also, early on this Court recognized that once the conspiracy was completed then:
Acts performed, or declarations made, after the consummation of the object for *880 which the parties combined, can upon no principle, be considered part of the res gestae; much less can an act done or declaration made, after the execution of a common design be regarded as performed or made in the prosecution of such design.
Browning v. State, 30 Miss. 656, 671 (1856).
The statements offered by Hentz, Morrow and Tutor clearly fall within the holdings of these cases. Roger Hentz and Bill Morrow each testified that about a week after the murder, they met with Larry Hentz and Owen Lee Harden at a motel where the murder was described. These statements are nothing more than boasts of both Hentz and Harden and were not statements made during the course of and in furtherance of the conspiracy. Even if these statements were made in the course of an ongoing conspiracy to collect the insurance proceeds, as the State has suggested, they cannot be construed to be in furtherance of that conspiracy because they do not appear to be designed to bring about the recovery of these proceeds. This reason especially applies to the testimony of Bobby Joe Tutor wherein he stated that Harden told him that he killed a man for money long after the murder had been completed. Admission of this testimony then was erroneous.
However, we do not reverse on this point. These statements erroneously admitted by the trial judge did not mention nor implicate Mrs. Williamson as being part of the murder plan and did not unduly prejudice her case. Nevertheless, upon retrial we point out that the new Mississippi Rules of Evidence will be applicable and these statements should not be admitted into evidence. See Miss.R.Evi. 801(d)(2)(E) and Comment.

PROPOSITION VI.

DID THE TRIAL COURT ERR IN REFUSING TO GRANT A CIRCUMSTANTIAL EVIDENCE INSTRUCTION?
Williamson argues that the State failed to offer any direct evidence of her participation in the murder of James Williamson or any direct evidence that she was a party to the conspiracy to the murder. From this, she argues that Instruction D-5 should have been given because the State's case was based wholly on circumstantial evidence.
Circumstantial evidence instructions are required only where the prosecution is without a confession and wholly without eyewitnesses to the gravamen of the offense charged. Keys v. State, 478 So.2d 266 (Miss. 1985); see also Bunkley v. State, 495 So.2d 1 (Miss. 1386) (affirming Keys). A review of the evidence in this case reveals that the State was without both. Mrs. Williamson gave no confession either as being a participant in the murder or the conspiracy to commit the murder. Additionally the testimony offered by the State did not directly link Mrs. Williamson to either the murder or the conspiracy. Rather, it required the jury to draw upon inferences and suspicious circumstances in order to return a conviction. Clearly, the circumstantial evidence instruction was warranted under the facts presented to us today. Again however, we do not reverse on this point but suggest that upon retrial such an instruction should be given if the same evidence is presented by the State.

PROPOSITION VII.

DID THE TRIAL COURT ERR IN EXCUSING CERTAIN JURORS FOR CAUSE?
Mrs. Williamson claims that five jurors were erroneously excluded for cause because each stated that they could either follow the law, did not have scruples against the death penalty, or felt that the death penalty was appropriate in certain cases. Although we find her argument to be unpersuasive, we nevertheless feel the need to briefly discuss the procedures to be employed by circuit courts during voir dire of prospective jurors in capital cases.
Prospective jurors in capital cases may only be excluded for cause based upon *881 their views on capital punishment when those views would "prevent or substantially impair the performance [their] duties as juror[s] in accordance with [their] instructions and oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851-52 (1985); Gray v. Mississippi, ___ U.S. ___, ___-___, 107 S.Ct. 2045, 2051-52, 95 L.Ed.2d 622 (1987) (reaffirming Witt.) This standard was adopted by this Court in Fuselier v. State, 468 So.2d 45, 55 (Miss. 1985). In subsequent decisions, we recognize that this standard does not require the jurors bias against the death penalty be proven with unmistakable clarity and noted that great deference must be paid to trial judges' decisions as to whether a juror may properly be excused for cause because of the inherent difficulty in formulating an exact set of questions and answers that would disqualify a juror. See Stringer v. State, 500 So.2d 928, 943 (Miss. 1986); Irving v. State, 498 So.2d 305, 312 (Miss. 1986). Further, because the trial judge hears and sees the individual jurors, he is in the better position to evaluate their responses and determine whether or not they should be excluded for cause.
For the purposes of this case, we need not detail the voir dire of each challenged juror. All jurors who indicated reservations concerning the death penalty were brought into chambers and individually questioned about such views. From their responses, it is clear to us that each stated at one time or another that he or she could not return a death penalty under any circumstances. Such a stance will prevent them from following the law and their juror's oath, thus rendering them excludable for cause under the test set forth in Witt. However, we remind trial judges across the state that if there is any question concerning whether a prospective juror may be properly excluded for cause based on his views on capital punishment, the trial judge should conduct his own independent examination of the jurors to determine whether they can follow the testimony, the instructions, and their juror's oath and return a verdict of guilt even though such a verdict could result in the imposition of the death penalty. Those jurors who can follow the evidence and instructions of the court should be retained and those who cannot should be released. Armstrong v. State, 214 So.2d 589, 593 (Miss. 1968), cited with approved in Gray v. State, 472 So.2d 409, 421 (Miss. 1985). This procedure takes on even greater significance in light of the United States Supreme Court's recent holding in Gray v. Mississippi, ___ U.S. ___, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). In that case, a juror who met the test in Witt was excluded for cause. The Supreme Court reversed noting that when a juror meets the standards imposed under Witt it is reversible error to exclude that juror on a challenge for cause. Gray v. Mississippi, ___ U.S. ___, ___, 107 S.Ct. 2045, 2056-57, 95 L.Ed.2d 622 (1987). Faithful adherence to the procedure outlined in Armstrong will serve a two fold purpose:
(1) It will help to clarify when a potential juror may be properly excluded for cause based on his opposition to the death penalty; and
(2) More importantly, it will serve to ensure that a fair and impartial jury is selected.

PROPOSITION VIII.

DID THE TRIAL COURT ERR IN FAILING TO GRANT A MISTRIAL DUE TO IMPROPER INFLUENCE OF THE JURY?
During the course of the trial, a juror reported to a bailiff that he had heard rumors regarding Mrs. Williamson being visited by another prisoner in her cell while the two were incarcerated. The statements were allegedly made in front of all other male jurors. Upon learning of the situation, defense counsel made a motion for a mistrial and questioned the bailiff concerning the alleged rumor. The motion for a mistrial was denied as was a subsequent motion for a new trial raising the same issue.
The most fundamental and sacred rights secured for the criminal defendant is his right to a trial before a fair and impartial jury. Johnson v. State, 476 So.2d 1195, *882 1209 (Miss. 1985). Because of this, once the jury is empaneled, all cautionary measures possible should be taken to prevent extraneous or outside influence from reaching the jury in an effort to ensure impartiality and to ensure that the accused receives a fair trial. The jury's verdict must be based on the evidence before them. Outside influences must be eliminated if possible and minimized otherwise or the verdict rendered is questionable and a mistrial is appropriate. Fuselier v. State, 468 So.2d 45 (Miss. 1985).
Although defense counsel brought the alleged outside influence to the court's attention through a motion for mistrial, she offered little proof in support of this motion. No efforts were made to call and examine those jurors allegedly infected by the extraneous materials. In short, counsel failed to preserve a sufficient record from which we can discern whether a mistrial should have been granted. However, we are quick to point out that whenever there is a question concerning outside influencing of a jury, the trial judge himself ought to examine the jury carefully to ensure that the jury's deliberations are based on the evidence produced at trial and not extraneous matters. Nevertheless, since we have reversed the conviction on other grounds we need not reverse here.

PROPOSITION IX.

WAS THERE A 4.06 DISCOVERY VIOLATION?
Finally, Williamson argues that the trial court erred in failing to give her copies of written statements made by three witnesses prior to the cross-examination of those witnesses. Rather, the trial judge viewed the statements in camera and determined that there was not any material inconsistency in the statements and in the testimony given at trial. At the time of trial, this was an accepted procedure and our review of the statements reveal that the trial judge's determination was correct.
However, in a recent case, Barnes v. State, 471 So.2d 1218 (Miss. 1985), we held that all prior statements of a witness which are materially inconsistent with the testimony given at trial must be released to opposing counsel prior to cross-examination of that witness. Barnes, 471 So.2d at 1221. More recently, we have held that prosecuting attorneys should make available to attorneys for the defense all materials, whether written or recorded, in order that the defense may determine whether or not the material is useful to the defense of the case. Hentz v. State, 489 So.2d 1386, 1388 (Miss. 1986). The statements in this case clearly fall into this category and should be made available to the defense prior to the retrial of this case. Further, we take this opportunity to remind circuit judges and prosecutors alike. Rule 4.06 envisions a two way discovery and contemplates complete cooperation between the parties in order to avoid trial by ambush and to ensure that the criminal defendant is afforded a fair trial. Although our decisions in this area have been something less than consistent, we urge trial judges especially to pay close attention to the guidelines set forth in Rule 4.06 and our caselaw interpreting it in order to avoid costly errors which might otherwise cause reversal. See Hentz v. State, 489 So.2d 1386, 1389 (Miss. 1986); see also, White v. State, 498 So.2d 368, 370 (Miss. 1986); Foster v. State, 493 So.2d 1304, 1308 (Miss. 1986); Johnson v. State, 491 So.2d 834, 837 (Miss. 1986). Williamson's other alleged 4.06 violations are without merit and warrant no further discussion.
With regard to Mrs. Williamson's remaining assignments of error, we find that each lack merit. For that reason they will not be discussed herein.

CONCLUSION
James Williamson was the victim of a despicable murder. However, the prosecution's quest for justice must not go outside the bounds of the constitution. The framers of the Constitution took great care to ensure that all those accused of a crime received a fair trial before being punished and left the courts to zealously guard these rights. We must do so. Cecilia Williamson was denied a fundamental constitutional *883 right, namely the right to confront and cross-examine the witnesses presented against her. Because of this deprivation, we must reverse her conviction and sentence and remand the case for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] Mrs. Williamson had previously been charged with the crime by affidavit issued on June 21, 1982. However, the charges were dismissed without prejudice on the state's initiative in a habeas corpus proceeding conducted on June 30, 1982, in the Circuit Court of DeSoto County.
[2] Roger Lynn Hentz agreed to testify on behalf of the State in exchange for a plea bargain agreement concerning other felony charges pending against him.
[3] Because we reverse the conviction based upon errors occurring during the guilt phase of Williamson's bifurcated trial, we find it unnecessary to detail the testimony offered during the sentencing phase.
[4] Mrs. Williamson has assigned 58 alleged errors which she contends require reversal of her conviction and sentence of death. However, in her brief, she has combined these errors into 17 propositions for our consideration. We will address only those propositions which merit discussion.