733 So.2d 325 (1998)
Herman SAUNDERS a/k/a Herman Fitzgerald Saunders a/k/a Robert Marsh a/k/a Mickey Marsh a/k/a Adrian Marsh, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-00657 COA.
Court of Appeals of Mississippi.
December 30, 1998.
Rehearing Denied April 20, 1999.
*327 William B. Kirksey, Jackson, Attorney for Appellant.
Office of the Attorney General by Charles W. Maris, Jr., Attorney for Appellee.
Before BRIDGES, C.J., and PAYNE and SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. Herman Saunders was convicted by a Lamar County jury of two counts of capital murder. He appeals alleging these to be errors: (1) applying the murder for hire statute to the killing of a chance victim; (2) admitting evidence of a prior bad act; (3) informing the jury of Saunders's status as an habitual offender; (4) calling of a witness who was expected to invoke his Fifth Amendment rights; and (5) admitting evidence of a co-conspirator's prior conviction. We find no error and affirm.

FACTS CONSISTENT WITH VERDICT
¶ 2. On September 9, 1993, Herman Saunders fired shots into a vehicle occupied by Bennie Brown and Gloria Lampley. Lampley was then Saunders's girlfriend and by the time of trial was his wife. On October 30, 1993, which was two days before Brown was to testify about Saunders before a Lauderdale County grand jury, Brown and his niece were murdered.
¶ 3. Approximately two weeks before the murders, Saunders met with Carlos Stewart and Danny Porter for the purpose of purchasing a gun from them. He mentioned wanting someone killed. One week later, Stewart and Porter again met with Saunders at a local bar. Saunders informed Porter that he would pay him and Stewart $3,000 each for killing someone. Another meeting occurred the night before the murders. This time, Saunders provided details, informing Stewart and Porter that he wanted Bennie Brown killed because he was going to "send him to jail." Saunders attempted to procure a second handgun for Porter and Stewart but was unable to do so. He then drove them past Brown's home. Saunders informed them that Brown drove a red Porsche and they would know whether he was home by its presence in the driveway. Porter and Stewart were then instructed by Saunders to go in through the backyard and not the front of the house.
¶ 4. Early the next morning, the two gunmen approached Brown's home from the rear. They knocked and Brown's niece, Natasha Cole, answered. Stewart panicked, as he knew Cole and feared that she would be able to recognize him. When Brown approached the door, Stewart attempted to close it and flee. Instead, Porter burst through the door and shot Brown. The two contract killers then fled to their vehicle. Stewart told Porter why Cole might recognize him. They decided to kill Cole as well. Stewart went back inside the home and found Cole hiding in a crawlspace in the attic. He shot her four times.
¶ 5. Stewart, Porter, and a friend eventually stopped at a Hattiesburg hotel and Porter phoned Saunders. The next morning, Saunders arrived and the group followed him to the Mississippi Gulf Coast. At a beach pavilion, Saunders paid Porter and Stewart $3,000 each. They then traveled to New Orleans, and, after a few days, returned to Gulfport where they placed their friend on a Hattiesburg bound bus. Porter and Stewart fled to Atlanta. While in Atlanta, the two met with Saunders who said that because of a nationwide search *328 for them, he was surrendering to police. A few days later, Porter and Stewart were arrested in Atlanta.
¶ 6. Saunders was charged with one count of conspiracy to commit murder and two counts of capital murder for the deaths of Bennie Brown and Natasha Cole. The conspiracy charge was dropped. After a jury trial, Saunders was found guilty on both counts. Since the jury was unable to decide on a sentence, the trial judge sentenced Saunders to two terms of life in prison without the possibility of parole, with the sentences to run consecutively.

DISCUSSION

I. Capital murder of Natasha Cole
¶ 7. Saunders makes a technical legal argument concerning whether he could be guilty of capital murder of Natasha Cole. She was not the target of Saunders's murderous contract but got in the scheme's way. At most, Saunders alleges, he could be guilty of the simple murder of Cole. He then argues that the jury instructions did not permit conviction of simple murder.
¶ 8. Capital murderany murder for which the death penalty is a possibility encompasses specifically defined crimes that do not necessarily include all heinous murders. Saunders was indicted under the murder for hire subsection. Miss.Code Ann. § 97-3-19(2)(d) (Rev. 1994). Saunders argues that even though this subsection certainly applies to the killing of Bennie Brown, that it cannot apply to the killing of Brown's niece, Natasha Cole. Her murder was not an explicit part of the contract. The supreme court has not considered the contracting party's culpability under the capital murder statute for a secondary murder occurring during the commission of a murder for hire. This is not suggesting that the absent, contracting party cannot be criminally responsible for the secondary murder, but challenges whether it is a capital offense. Saunders is not guilty of capital murder for Ms. Cole's death unless the statute can be reasonably interpreted to make him so.
¶ 9. Murders that occur during the commission of specific felonies can be charged as capital murder: a murder during "the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery," and certain other sexual crimes. Miss.Code Ann. § 97-3-19(2)(e) (Rev. 1994). However, a murder that occurs during the commission of another capital murder is not an enumerated capital murder crime. Saunders was not indicted for Ms. Cole's under that subsection anyway but under the murder for hire subsection.
¶ 10. The only possible subsection for Saunders's guilt of capital murder for Ms. Cole's death is the one the State used: "(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals...." Miss.Code Ann. § 97-3-19(2)(d) (Rev.1994). Saunders argument starts from the premise that the unwritten contract that structures the murder for hire must be defined narrowly. This section of the capital murder statute applies only to a killing perpetrated by someone who will be paid "for committing the murder...." Saunders argues that only Bennie Brown's murder was part of the contract for which he would receive payment. We must analyze that claim.
¶ 11. Porter and Stewart were explicitly offered money to murder Bennie Brown. Different scenarios could arise under such an agreement. If the person seeking to hire killers knows that another person lives with his intended victim and expressly states that the other person should be killed if she is present, then part of the reason that the money is promised is for the killing of the secondary person. If however the employer of murderers has no idea whether anyone else might be present, but just says generally to kill anyone who witnesses the crime, a secondary killing that occurs is a little more unstructured *329 but would still be within the contract.
¶ 12. Ms. Cole's murder was one step further removed. There is no evidence that the various participants in this fatal contract articulated in their scheming the murder of anyone but Bennie Brown. Carlos Stewart committed the murder. Counsel for Saunders asked him whether he, Saunders and Porter had ever entered into an agreement to kill Ms. Cole, and Stewart said that they had not. Stewart testified that he decided to kill her "in order to get away with what we were doing at the time," as removing her was necessary. However, with various degrees of specificity, Porter and Stewart were required by the contract to murder Bennie Brown secretly, with a step-by-step approach established by Saunders on how to enter the house, and with an overall implied requirement that they avoid capture and discovery of the participants. Saunders could have been found guilty of capital murder for Ms. Cole's death if the jury was properly instructed to conclude that the scheme that he entered contemplated the killing of someone such as she.
¶ 13. In other words, a murder for hire can be directed at one primary victim and several secondary targets. The victims within the contract can be named or unnamed. The capital murder statute criminalizes under the potential sentence of death the offering of money for the killing of other human beings. Each victim who is killed as an anticipated part of the overall agreement to murder one person is as much a part of the murder for hire as is the principal target. That is because the contract is not complete until the principal and all secondary targets are killed. Even though Stewart said that he decided to kill Ms. Cole, the jury could find that Saunders's bargain with Stewart and Porter implicitly included someone such as Ms. Cole: someone who got in the way.
¶ 14. The relevant instruction permitted the jury to determine guilt if Ms. Cole was killed after Saunders set the killing of Bennie Brown in motion, when he "knew or should have known that lethal force and or death might be used against persons other than Bennie Brown, Sr. in order to accomplish the capital murder" of Brown. The important phrasing is that Saunders knew the killing of Ms. Cole was "in order to accomplish the capital murder" of the principal target of the contract. That is an adequate instruction for the jury's consideration of these issues.
¶ 15. Holding one person responsible who, though not present, is a principal in the overall crime is standard criminal law. The supreme court held "that when two or more persons act in concert, with a common design, in committing a crime of violence upon others, and a homicide committed by one of them is incident to the execution of the common design, both are criminally liable for the homicide. The fact that the accused did not fire the fatal shot does not relieve him from criminal responsibility for the death of [the victim] who was slain by the accused's confederate in carrying out the common design to rob." Price v. State, 362 So.2d 204, 205 (Miss. 1978).
¶ 16. Even when the defendant is not present during the commission of the crime which resulted in the victim's death, he can nonetheless be found guilty of capital murder. Ballenger v. State, 667 So.2d 1242, 1255 (Miss.1995). There, the court noted that "[w]hile it is true that a defendant involved in an armed robbery in which a killing occurs but who did not do the actual killing must have at least contemplated the use of lethal force before the death penalty may be imposed, no such contemplation or intent is required to be found in the guilt phase." Id. at 1254.
¶ 17. We conclude that if the jury was properly instructed to determine whether a secondary killing was reasonably anticipated to be necessary in order to accomplish the contract killing, then that secondary killing is also part of the contract and the absent principal can be *330 held guilty of capital murder. The jury was so instructed. The evidence supports the verdict.
¶ 18. Saunders raises no constitutional issues under the Eighth Amendment. We need not decide whether the prohibition of "cruel and unusual punishments" would permit assessing the death penalty to the party initiating a murder for hire when the murder is of an initially unnamed secondary target who observed the killing. Saunders was sentenced to life, not death. Considering that the supreme court reviews all appeals in which death is the sentence imposed, we would have no authority to decide the issue. Miss.Code Ann. § 9-4-3(1) (Supp.1998). We only hold that the criminal statutes permitted Saunders to be indicted and convicted for capital murder of Ms. Cole.

II. Evidence of another bad act
¶ 19. Stewart testified that Saunders objected to their friend, Nakia Mason, being present with them in Gulfport when they received payment for the crime. Stewart testified that Saunders instructed him and Porter to kill Mason. They refused to do so. Saunders argues that this is evidence of an inadmissible "other crime, wrong or act" under Rule 404(b) of the Mississippi Rules of Evidence. The trial judge found that this incident constituted part of the "grand action" and overruled Saunders's objection.
¶ 20. Evidence of other bad acts committed by a defendant is not generally admissible as a part of the State's case-inchief. Neal v. State, 451 So.2d 743, 758 (Miss.1984). However, there are exceptions. Evidence of other crimes, wrongs, or acts is admissible if the offense then being tried and the other offense are "so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences." Id. at 759. The rationale for admitting evidence of certain closely related acts is that the State "has a legitimate interest in telling a rational and coherent story of what happened...." Brown v. State, 483 So.2d 328, 329 (Miss.1986). The supreme court has recognized that presenting a complete story of the alleged offense might require revealing information about other wrongs perpetrated by the defendant. Id.
¶ 21. In one precedent a defendant recruited three individuals to rob her elderly aunt. Ballenger v. State, 667 So.2d 1242 (Miss.1995). The three arrived at the home of the aunt, and when she informed them that she had no money, they beat her unconscious. Later, when the defendant learned that her aunt was still alive, she instructed them to return to the home and burn it with her aunt still inside. Id. at 1248. The court found that although it occurred after the robbery, "the decision to return and burn [the] house was an integral part of the story surrounding [the aunt's] death.... The evidence showed that [the defendant] had the intent that [her aunt] be killed so that she, Ballenger, would not be linked to the robbery. It shows Ballenger's plan to cover up the robbery by burning the house." Id. at 1257.
¶ 22. An effort to eliminate any potential witnesses has similarly been held admissible as part of a single transaction. A defendant, after robbing and murdering a homeowner, murdered the man's wife as well. Lockett v. State, 517 So.2d 1317, 1321 (Miss.1987). The court held that this killing "was clearly motivated by Lockett's desire to effect a successful escape from his murder of Mr. Calhoun." Id. at 1331. Here, the jury reasonably could have concluded that Saunders wanted Mason dead in order for the rest of the participants to avoid capture for the murders. Saunders's request that Mason be killed was part of the entire transaction.
¶ 23. However, even if the evidence is relevant, "there is still the need to balance its probative value against the usual counterweights." Indeed, this is the analysis employed in applying the identical federal rule. This requires the trial court *331 to determine whether the "probative value is substantially outweighed by the danger of unfair prejudice, etc." Lockett, 517 So.2d at 1331. This balancing is left to the trial court's broad discretion, and we find that the trial court did not abuse its discretion here.
¶ 24. We note Saunders's complaint that the trial judge made no explicit on the record finding that the probative value of Saunders's statement was outweighed by its prejudicial effect. The supreme court has held that an on-the-record balancing is not mandatory. Blue v. State, 674 So.2d 1184, 1222 (Miss.1996). We find no error.

III. Habitual offender
¶ 25. When Saunders's aggravated assault charges were pending (the charges that led to the contract for Bennie Brown's murder), the Lauderdale County authorities were unaware of his two prior convictions. Therefore he was not charged as an habitual offender. The Lauderdale District Attorney, Bilbo Mitchell, was a witness for the prosecution during Saunders's capital murder trial. He testified that he was forced to drop the aggravated assault charge against Saunders due to Brown's death. If convicted, Mitchell stated that Saunders would have served a maximum of twenty years in prison. On cross-examination, he admitted that under the law as it existed in 1993, Saunders would have been eligible for parole after serving only two years. Perhaps the defense was trying to minimize the plausibility of Saunders's having obtained a contract to murder Brown just to avoid two years in prison. The trial court allowed the State to ask a hypothetical question to respond to this issue. On redirect the State asked, once an individual was indicted as a non-habitual offender and it was later discovered that he indeed was an habitual offender, what the district attorney's options would be. District Attorney Mitchell responded "[t]hat happened in this case."
¶ 26. Saunders then moved for a mistrial based upon the fact that the jury became aware of his habitual offender status despite the judge's instructions that such questions only be hypothetical. The State countered that Saunders had opened the door to this line of questioning by asking Mitchell about parole eligibility. The State argued that it had the right to correct the misimpression.
¶ 27. The judge denied Saunders's motion for a mistrial but stated that he did not want the jury to know that Saunders was an habitual offender. He allowed the State to ask Mitchell whether Saunders was indicted as an habitual offender in this case to which Mitchell responded that he was not. The judge then told the jury that "we won't get into anything concerning that since it doesn't apply" to Saunders.
¶ 28. The defense did open to door to the habitual offender testimony when it asked about parole eligibility. There may have been an awareness by the defense that Saunders was in fact an habitual offender. By asking this question, Saunders's counsel may have hoped for a misimpression. Regardless of the consciousness of the tack, the defense assumed the risk that the jury would be made aware of any adverse information. The jail time that Saunders would have served for aggravated assault was made an issue by the defense and the State responded.

IV. Danny Porter's testimony

¶ 29. Danny Porter took the stand at trial and pled the Fifth Amendment when asked "were you and Carlos Stewart hired by Herman Saunders to kill Bennie Brown, Sr?" This was the only question asked of the witness. Saunders objects on the basis that the prosecution was aware that Porter planned to invoke the Fifth Amendment. According to him, the State put Porter on the witness stand solely to allow the jury to infer impermissibly that Saunders had hired him.
¶ 30. The supreme court has recognized that "a criminal defendant must be allowed to call witnesses to the stand even though *332 those witnesses intend to invoke their privileges against self-incrimination as secured by the Fifth Amendment.... The State should also be afforded the same right." Williamson v. State, 512 So.2d 868, 872 (Miss.1987). The State asked a witness a series of questions based on that witness's former alleged confession; to each the witness pled the Fifth Amendment. The court did not find that reversible error but reversed because two people who were present when the earlier statement was made were allowed to testify as to the contents of the witness's confession. Id. at 871. Since the defendant's Sixth Amendment right to confront and cross-examine the witnesses against him was violated by the testimony of other witnesses regarding the confession, the conviction was reversed. Id. at 872-73.
¶ 31. Williamson was corrected by a later case:
We confront today more than [the witness] Krecic merely "claiming the Fifth." Preceding each such claim prosecuting counsel purportedly read from her earlier, pre-trial statement implying Hansen's guilt and thus leading us to Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) as the case of consequence. At Douglas' trial the prosecution called his accomplice, Loyd, and produced a confession purportedly signed by Loyd. The prosecuting attorney then began to read from the confession, pausing after every sentence or two to ask Loyd if he had "said that," only to have Loyd claim his privilege against selfincrimination. As with Krecic here, Loyd neither admitted nor denied anything, claiming only "the Fifth Amendment." The confession was never offered as evidence. The Supreme Court reasoned "Although the... [prosecuting attorney's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the ... [prosecuting attorney's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true." Douglas, 380 U.S. at 419, 85 S.Ct. at 1077, 13 L.Ed.2d at 937-38. Since Loyd claimed the privilege to defense questions as well, and since the prosecuting attorney "was not a witness... [who could] be tested by cross-examination," the Court found an offense to Douglas' Confrontation Clause rights and reversed.
Hansen v. State, 592 So.2d 114, 134 (Miss. 1991). As we noted above, the State under Williamson has the right to call a witness even though it is aware that the witness will assert his Fifth Amendment privilege. That part of Williamson remains good law. Blue v. State, 674 So.2d 1184, 1234 (Miss.1996) It is permissible for the State to call the witness and ask a question in order to assure the invocation of the right.
¶ 32. What the State may not do is ask the witness a series of questions regarding the facts in a statement as an indirect method of getting the statement into evidence. This deprives the defendant of his rights under the Sixth Amendment's Confrontation Clause, as he is unable to cross-examine the witness who implicitly has testified against him. In the present case, only one question was asked of the witness, establishing concretely that the witness would not testify. There was no intimation in the question that Porter had ever confessed to his and Saunders's guilt but was now remaining silent. Saunders was not deprived of his Sixth Amendment rights.

V. Carlos Stewart's testimony

¶ 33. Finally, Saunders cites as error Carlos Stewart's testimony that their co-conspirator, Danny Porter, had been convicted of a prior felony. On cross-examination, the defense posed a series of questions to Stewart about the plea bargain that he had reached with the State. Some questions were clearly condemnatory *333 of the State's willingness to deal with Stewart. For example, Stewart was asked, "[t]he State of Mississippi made a bargain with you, a murderer, to give you a life sentence; didn't they?" Other questions also implied that the State erred in bargaining with Stewart.
¶ 34. The State is allowed to show the context in which the decision to deal with Stewart rather than Porter was reached. Between the two, Stewart was the more credible, as he had no prior felony convictions. Such testimony made the Stewart plea bargain more understandable for the jury.
¶ 35. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT ON CHANGE OF VENUE FROM THE LAMAR COUNTY CIRCUIT COURT OF CONVICTION OF TWO COUNTS OF CAPITAL MURDER AND SENTENCES OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO RUN CONSECUTIVELY WITHOUT THE POSSIBILITY OF PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO LAMAR COUNTY.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HERRING, HINKEBEIN, KING and PAYNE, JJ., concur.