501 So.2d 424 (1987)
Candler G. PEOPLES
v.
STATE of Mississippi.
No. 56763.
Supreme Court of Mississippi.
January 21, 1987.
*425 H.A. Courtney, Robert W. Camp, Jackson, Anselm J. McLaurin, McLaurin & McLaurin, Brandon, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Henry C. Clay, III, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and DAN M. LEE and GRIFFIN, JJ.
DAN M. LEE, Justice, for the Court:
Candler "Candy" Peoples brings this appeal from her conviction in Rankin County Circuit Court of conspiracy to murder her husband, John Paul Peoples, who was killed sometime during the night of July 18, 1984. Her trial was held May 13 and 14, 1985, and she was sentenced on May 17, 1985 to twenty (20) years in the custody of the Mississippi Department of corrections. She assigns two (2) errors:
I.
The evidence adduced was insufficient to sustain the charge of conspiracy to commit murder and therefore, the verdict was against the overwhelming weight of the evidence.
II.
The verdict was the result of bias, passion and prejudice on the part of the jury.

FACTS
Candy Peoples and John Paul Peoples were married on October 31, 1980. Candy met Jim Cooper in February of 1984. Sometime around the end of March or the first of April of 1984, Candy and Jim Cooper began dating each other. At some point in time after this, the exact date of which Candy could not remember, Paul had told Candy to gather her things and leave the house because he did not feel that she was acting the way a "Peoples" was supposed to act.
In late June and July, 1984, Candy lived with Cooper for two and one-half weeks in a trailer out behind the house of a friend.
On Monday, July 16, 1984, Candy had returned home to Paul Peoples to try and make their marriage work. On Tuesday, July 17, both of them got up and went to work as usual and it was just a normal day. They again got up and went to work as usual on Wednesday, July 18, 1984. Candy talked to Paul several times throughout this day and at one point during the day requested that Paul take the maid home because she was going to try and get her hair done that afternoon. Candy's hairdresser testified Candy did not keep the appointment. Later that week Candy called and asked her to tell anyone who asked that she had kept the appointment. However, in reality, after work on this Wednesday, Candy went over to Mickey and Sharon Dements' house around 5:15 or 5:30. It was not unusual for her to meet several friends there. Several people were already at the Dements' house when she arrived. Sometime later, Jim Cooper arrived at the Dements' house. Billy Reis also showed up.
Cooper and Billy Reis went out on the porch away from people to talk. Cooper then returned and asked Candy if she was going to stay with him that night, but she said no, she was going home to her husband. Again Cooper and Reis talked outside, and when Cooper returned this time, he asked if Candy would stay with him that night if everything was going to be "okay" by the weekend. Candy testified that she didn't know what he was talking about, but she said "okay." Billy Reis left the Dements' and sometime after that, Candy and Jim Cooper went in Candy's car to Doug and Frank Addison's house in Richland, Mississippi. The Addisons owned the trailer where Cooper and Candy had lived together.
After arriving at the Addison house, Jim Cooper made a telephone call and a short *426 time afterwards, Billy Reis showed up there. Jim Cooper and Billy Reis had another private conversation at the Addison house. After this conversation, Jim requested that Candy call her husband. Candy testified that she asked Cooper why, but Cooper didn't answer. He finally told her to tell Paul that she had car trouble and Candy said that when she asked, "Why, what are you doing?" Cooper replied don't worry, everything's okay.
Candy made the call to her husband. In the statement she gave police following her arrest, Candy said she told her husband what Cooper had requested. She told Paul that she had had car trouble near the swinging bridge on Old Byram Road. At trial, Candy said she could not remember exactly what she told her husband because she had been drinking. She said at trial that she did not tell her husband to go down to the river, but in her statement to police, Candy said Paul replied that he thought he ought to go check on the car. She testified she had no intention of tricking her husband.
After making this call, Candy fell asleep on a couch. Cooper returned later and awoke Candy. He told her it was 4:00 a.m. and she testified that she was in no condition to drive home and slept until sunrise.
The body of Paul Peoples was found Friday, July 20, 1984, washed up on the bank of the Pearl River, near the swinging bridge. The cause of death had been a gunshot wound behind and below the right ear. In due time Cooper, Reis and appellant were indicted on various charges in connection with this homicide.
A couple of days prior to Wednesday, July 18, 1984, Jim Cooper had asked Candy about a pistol that she regularly carried in her purse. She got the pistol out and said that it needed cleaning and Jim Cooper took it from her, telling her that he would clean it. Candy just said okay. She never saw the pistol again and never asked him about its whereabouts, even after her husband was reported missing. Candy testified that the pistol introduced as the murder weapon certainly resembled the pistol that Jim Cooper had gotten from her.
Candy's co-workers recounted the contents of letters they had seen in Candy's desk. Candy admitted she had kept letters from Cooper in her desk, and these bore the initials "J.C." or "J.T.C." The letters stated that the author wished he could get Paul out of the way so that "they" could live their own lives. The writer couldn't understand why Paul was trying to keep Candy just for himself. The writer said he couldn't stand the thought of Candy living with "him." Another letter stated that the writer felt like Candy was a puppet and that her husband held the strings. Yet another stated that the writer wished that he could punch Paul out every time he saw him. These letters were dated no later than April or May of 1984, but the exact dates were uncertain.
In spite of these facts, Candy told police that she never thought Cooper or Reis would kill Paul. She told police she thought Cooper wanted Paul away from the house so they could trash the yard. She told police on a different occasion that the thought crossed her mind that Jim and Billy Reis might beat up Paul down by the swinging bridge.
After waking up, Thursday, July 19, Candy got dressed and she and Jim Cooper went over to her house in her automobile. When they got there, she saw that her husband's car was still there. She found this unusual as he would ordinarily be at work. She called her husband's place of employment and asked if he was there. His father said that he was not, but he told her not to worry as possibly Paul had told someone else that he would be taking the day off and that Mr. Peoples just did not know about it. She called in to work and told them that she had some personal things to take care of, and if she came in at all that it would be later. She went out on a tree-cutting job with Jim Cooper and Ronnie Addison that day where there were no telephones, but she testified she drove to a store to make calls to check about Paul throughout the day.
After Jim Cooper finished his work that day, Candy and Jim took Ronnie Addison *427 home and then went by the Dements' house. After they left the Dements', they went over to Candy's house. Upon driving up in Candy's driveway, Mr. Peoples, Sr. pulled up behind them in his automobile. They spoke briefly, and Candy said she still knew nothing of Paul's whereabouts. Mr. Peoples left but later returned. Mr. Peoples had Detective Presley of the Jackson Police Department with him when he returned. Detective Presley, who was a neighbor of Mr. Peoples, again asked Candy if she had seen or heard from Paul and Candy replied that she had not. She then began to feel very uneasy about this situation and realized that Paul was missing. Candy began to question Jim Cooper about the situation and Jim again would reply to her not to worry, that Paul would probably show up and that everything would be all right.
Cooper spent the night at Paul and Candy's home that Thursday. The next day, Candy's mother and brother arrived from Alabama. They were with Candy when police arrived with news of Paul's body being found.
When police arrived, Candy was sedated and asleep. After being awakened, Candy talked with police and consented to a search of the house. During this interview and two subsequent interviews before her arrest, Candy told police versions of her actions and whereabouts which differed from the final story recounted above. She testified that she did not tell everything to police at first because the police acted as if they knew something she didn't.
Neither Cooper nor Billy Reis testified at Candy's trial.

DISCUSSION OF LEGAL ISSUES

I.

WAS THE EVIDENCE INSUFFICIENT TO SUSTAIN A CONVICTION OF CONSPIRACY TO COMMIT MURDER, THUS RENDERING THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
Though Candy's assignment of error is capable of being interpreted as assigning both the sufficiency and the overwhelming weight of the evidence as errors, it appears the major import of her assignment is a contention that the verdict was against the overwhelming weight of the evidence.
Though the quantum of proof necessary for the state to overcome the separate attacks against the evidence may differ, and though a denial of a motion for a judgment n.o.v. does not control the disposition of the motion for a new trial, Pharr v. State, 465 So.2d at 302, we hold that the state's evidence meets the test under either standard of review.
A contention that the verdict is against the overwhelming weight of the evidence raises the question of whether the trial court erred in denying the defendant's motion for new trial. Rule 5.16, Uniform Criminal Rules of Circuit Court Practice.
In reviewing this contention, this Court keeps in mind the discretion vested in the trial court by virtue of Rule 5.16.
We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. [citation omitted] Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system.
Pharr v. State, 465 So.2d 294, 302 (Miss. 1984) (citing Groseclose v. State, 440 So.2d 297, 300 (Miss. 1983)).
Of course, a contention that the evidence was insufficient to support a finding of guilt requires review of the trial court's denial of the defendant's motion for judgment n.o.v.
Our familiar rule, in evaluating a j.n.o.v. motion, is that the trial judge  and this Court on appeal, as well  must consider all the evidence  not just the evidence which supports the prosecution's case  in the light most favorable to the prosecution. Gavin v. State, 473 So.2d 952, 956 (Miss. 1985); May v. State, 460 *428 So.2d 778, 781 (Miss. 1984). Evidence which supports the case of prosecution is taken as true. Gavin, 473 So.2d at 956; Warn v. State, 349 So.2d 1055, 1056 (Miss. 1977); Cochran v. State, 278 So.2d 451, 453 (Miss. 1973). All favorable inferences that may reasonably be drawn from the evidence are given to the prosecution. Gavin, 473 So.2d at 956; Griffin v. State, 480 So.2d 1124, 1126 (Miss. 1985); Glass v. State, 278 So.2d 384, 386 (Miss. 1973). If reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, then the peremptory instruction or j.n.o.v. must be granted. If evidence is present of such quality and weight that having in mind the beyond a reasonable doubt burden of proof standard, reasonable fairminded men in the exercise of impartial judgment might reach different conclusions, the request must be denied. 473 So.2d at 956.
Bunkley v. State, 495 So. 1, 3 (Miss. 1986)
The standards of review firmly in mind, we turn to the merits of Ms. Peoples' claim.
Ms. Peoples was convicted of conspiracy to commit murder in violation of Miss. Code Ann. § 97-1-1 (Supp. 1985).
Recently in Gray v. State, 487 So.2d 1304 (Miss. 1986), we defined conspiracy quoting extensively from Griffin v. State, 480 So.2d 1124, 1126 (Miss. 1985).
Conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy. The offense is complete without showing an overt act in furtherance of the conspiracy. Norman v. State, 381 So.2d 1024 (Miss. 1980); Moore v. State, 290 So.2d 603 (Miss. 1974); Pickett v. State, 139 Miss. 529, 104 So. 358 (1925).
* * * * * *
There must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose. McDonald v. State, 454 So.2d 488 (Miss. 1984). If there is an agreement, then knowledge of that agreement follows. The agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators.

Id. at 1306 (emphasis added). See also McCray v. State, 486 So.2d 1247 (Miss. 1986); James v. State, 481 So.2d 805 (Miss. 1985).
In Davis v. State, 485 So.2d 1055, 1058 (Miss. 1986), we further stated that "[i]t is settled that the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence... ." However, merely associating with conspirators does not make one a coconspirator. "There must exist some evidence that a defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." Id.
Ms. Peoples contends that the evidence failed to demonstrate that she knowingly entered into the common plan or intended to further its common purpose. Specifically, she maintains the state failed to show her entry into an "agreement" to kill her husband. At its worst, Ms. Peoples contends the proof only shows she was an accessory before the fact to the crime. See Miss. Code Ann. § 97-1-3 (1972), or an accessory after the fact. See Miss. Code Ann. § 97-1-5 (1972).
Ms. Peoples focuses on the "agreement" aspect in seeking to distinguish what she admits to doing from what she is accused of doing. In their brief, counsel for Ms. Peoples seize on federal precedents discussing the legal subtleties between aiding and abetting the commission of a crime and conspiring to commit it. However, Ms. Peoples tries to lead us in a direction in which we see no need to proceed because we do not here have a question of double jeopardy or collateral estoppel where the same operative facts are used to gain two or more convictions. Therefore, we do not *429 think this case requires that such distinctions be made.
Ms. Peoples could be correct that the proof at trial might support a conviction for being an accessory before the fact. Realistically, the same operative facts may support a charge of conspiracy as well as for accessory to the crime of murder. See e.g., Malone v. State, 486 So.2d 360, 363 (Miss. 1986).[1] However, we cannot say that the proof here failed to support the charge of conspiracy.
Ms. Peoples points to her testimony that she never thought Cooper would hurt her husband and that Cooper kept her in the dark concerning his evil designs. However, the jury was not required to accept her version in light of the great amount of circumstantial evidence of her involvement in a murderous scheme.
There was proof that up until two days before Paul Peoples disappeared Candy had been living with Jim Cooper. Candy kept letters written to her from Cooper stating that he wished Paul could be taken out of the picture. A couple of days before Paul's death Candy gave to Jim Cooper the gun her husband Paul had bought for her. She never questioned Cooper about the gun following Paul's disappearance. On the Wednesday night when Paul Peoples was seen alive for the last time, Candy called Paul and told him that her car stalled near the Swinging Bridge on Old Byram Road. This was not far from where Paul's body was found two days later.
There was proof that on Thursday Candy was outwardly concerned with her husband's unexplained disappearance but spent the night with Jim Cooper at the Peoples' home. She spent the day Thursday out at a job site with Cooper where no one could reach her. She told police differing stories concerning her actions and her actual involvement in her husband's death.
As we said in Davis, "from the evidence presented, this Court concludes that the jury could determine that a conspiracy ... existed as charged and that [Ms. Peoples] was no mere bystander but a member of the conspiracy." 485 So.2d at 1058.

II.

WAS THE JURY VERDICT THE RESULT OF BIAS, PASSION OR PREJUDICE?
Here Candy Peoples mainly reargues points previously raised. For purposes of this appeal we treat these arguments as also raising the question of whether the trial court erred in denying Ms. Peoples' motion for a new trial. In addition, however, Ms. Peoples argues that the jury wrongfully was permitted to hear irrelevant and prejudicial evidence. We have reviewed this claim and find it to be without merit.
The trial judge is given great discretion in receiving circumstantial evidence where a defendant is on trial for conspiracy. McCray v. State, 486 So.2d 1247, 1251 (Miss. 1986). We find no error in receipt of this evidence.
Finding the evidence sufficient and not suggestive of injustice, and finding that the verdict was not the result of bias, passion or prejudice, the conviction and sentence of Candler Peoples is hereby affirmed.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] We are not called upon here to decide whether the state may yet, consistent with the protection against double jeopardy, also prosecute Ms. Peoples as an accessory before the fact, Miss. Code Ann. § 97-1-3 (1972).