**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-KA-01280-COA**

**JAYLEN WINN A/K/A JAYLIN WINN**   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/03/2024 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS-BLACKMON |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | AKILLIE MALONE OLIVER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/03/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.    A Humphreys County Circuit Court jury convicted Jaylen Winn and his codefendant Santara Hall[1] of first-degree murder and conspiracy to commit murder.  Winn was sentenced to life imprisonment without eligibility for parole for the first-degree murder conviction and to serve ten years in custody for the conspiracy conviction, with the sentences set to run concurrently.  The trial court denied Winn's motion for judgment notwithstanding the verdict (JNOV).  Winn now appeals, contending that the evidence was insufficient to support the conspiracy conviction.  Notably, Winn does not contend the conviction of first-degree murder

---

[1] Santara's appeal was not part of this appeal.

should be reversed. Further, he contends that his trial counsel was ineffective for (a) failing to request a jury instruction on misfortune and accidental homicide and (b) failing to request a cautionary jury instruction to consider a certain witness's testimony with caution and suspicion. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the evening of March 14, 2022, nineteen-year-old Za'Quawn Byest (Byest) was at the Willow Bend Apartments in Belzoni, Mississippi, where he resided with his grandmother, Francis Byest.

¶3. During the afternoon on March 14, Danilyah Miles walked to the home of Santara Hall, Byest's cousin. While there, the two spent time together, smoked marijuana, and cared for Santara's infant child. During the visit, Danilyah received a phone call from Jaylen Winn, who asked her to do him a favor by getting Byest to come outside the apartment. Aware of an ongoing disagreement between Winn and Byest, Danilyah declined. Santara overheard the conversation and offered to get Byest outside, on the condition that Winn retrieve her gun from his cousin known as "Flee." Winn and Santara agreed to this exchange and continued communicating from that afternoon into the evening.

¶4. At approximately 8:50 p.m., Santara sent her cousin Byest a text message, inviting him to come meet her outside and smoke marijuana, and he agreed to do so.[2] Simultaneously, Santara was also communicating with Winn about luring Byest outside.

***The Shooting and The Investigation***

---

[2] Santara and Byest had an established relationship. They grew up together, spent the night at each other's homes, and at one time were next-door neighbors.

¶5.    At approximately 9:00 p.m., Francis heard the loud sound of a gunshot. When she looked out of the window, she observed an unknown person running, so she went outside. Francis called 911 and reported to the Humphreys County Sheriff's Department that she heard gunfire at Willow Bend. While outside, she went around the corner and found Byest near a dumpster.

¶6.    Dispatch contacted Chief Investigator Kenny Lewis of the Humphreys County Sheriff's Department at approximately 9:07 p.m. and sent him to the Willow Bend Apartments. While en route, dispatch called back and informed Lewis that a male had been shot and was lying in front of a dumpster. Lewis, the first member of law enforcement to arrive at the scene, discovered Byest's collapsed body in front of the dumpster.[3] Byest had succumbed to his wounds. Evidence indicated that there was a trail of blood from the Byest residence to a nearby dumpster. He first spoke with Kimberly Byest, Byest's aunt, who informed Lewis that Jaquavias Scott had picked up Byest's cellphone after the shooting. Scott surrendered the phone to Lewis. Byest's grandmother and aunt assisted Lewis in unlocking his cellphone.

¶7.    Near the scene, investigators recovered an empty cellphone case, one unspent bullet near Byest's head, a single round of live ammunition, a Glock model 21 .45-caliber semi-automatic pistol (serial number BUCL-154) located several feet from his body, and a loaded

---

[3] According to Lewis' testimony, he took a statement from Byest's friend, Jaquavias Scott, who was present at the crime scene. There was an objection to hearsay that was overruled. Lewis went on to state that Scott told him "that Za'Quawn always kept his gun behind the dumpster. That he was trying to get to his gun. And he didn't want to keep the gun at his grandmother's house."

3

extended handgun magazine found several feet from the handgun.

¶8.    While Lewis was still investigating the crime scene, dispatch notified him that Jaylen Winn had turned himself in at the Humphreys County jail in connection with Byest's shooting.

¶9.    Lewis interviewed Winn, who alleged the following scenario had occurred: He was sitting in a car in the Willow Bend parking lot in front of Byest's apartment with his friend Danilyah Miles, who was the driver. Winn alleged that Byest was pacing behind the car, approached the vehicle, opened the passenger door, and pointed a gun at him. According to Winn, he and Byest began tussling, and during the struggle, Byest's handgun discharged, striking Byest in the chest. This interview was recorded and entered into evidence (Exhibit S-17). Lewis seized Winn's cellphone, which was later sent to the Attorney General's office for forensic analysis.

¶10.    Lewis also interviewed Danilyah that same night at the sheriff's department. During this interview, Danilyah told Lewis that she was not with Winn, she did not know what was going on, and she did not know what he was talking about.

### *The Trial Testimony and Evidence*

¶11.    A jury trial was held in Humphreys County from June 24 to 28, 2024. The following witnesses testified on behalf of the State: Francis Byest, Frank Peretti, Jamie White, Danilyah Miles, Kenny Lewis, Tommy Bishop, and Milton Byest.[4]

---

[4] Milton Byest, Byest's father, testified to the history of the close "cousin" relationship between his son and Santara, his wife's niece. Milton stated that Santara was often with the family and staying over, and he took Santara on her first driving lesson. Thus, his son trusted her.

4

¶12. Francis, Byest's grandmother, testified that she returned home around 8:40 p.m. on the evening of the murder. Shortly thereafter, she heard the door slam, followed by the loud sound of a gunshot. When she looked out the window, she observed a person running and went outside. Neighbors approached Francis and instructed her to "get into her car and drive around the corner," where she found Byest lying face down near a dumpster. Francis also testified that she did not know Winn; however, she knew Santara because they attended the same church.

¶13. Tommy Bishop, a forensic scientist specializing in firearms with the Mississippi Forensics Laboratory, testified as an expert. Bishop stated that he was unable to match the bullet recovered from Byest's body to the gun submitted to the lab (the Glock model 21 .45-caliber semi-automatic pistol). Bishop testified, instead, that the bullet recovered from Byest's body was fired from a 9mm handgun.

¶14. Dr. Frank Peretti, a forensic pathologist and medical examiner with the Mississippi crime lab, performed the autopsy of Byest. A 9mm spent projectile was recovered from Byest's body. Peretti testified that Byest's gunshot wound was a distant gunshot wound, explaining that it was likely greater than two feet away. He explained that in a distant gunshot wound, a person can run and move and does not instantly die from that type of wound.

¶15. Jamie White, who works in the cyber crime division of the Mississippi Attorney General's Office, testified as an expert in digital forensics. White testified that he received an envelope with a cellphone inside from the Humphreys County Sheriff's Department, along

with a warrant and a request for digital forensic assistance. The envelope was labeled: "Suspects Santara Hall and Jaylen Winn." The International Mobile Equipment Identifier (IMEI) number within the cellphone was 587634 and matched the "preliminary device report" generated by the Cellebrite program, which is used for extraction and retrieval of information from cellphones. White confirmed that the report matched the device's number. White testified that the Iphone's Apple ID user was identified as jaylenwinn0@icloud.com.[5] Winn's phone was entered into evidence. White was able to retrieve text messages, Facebook messages, user logs, phone call logs, user Ids, pictures, documents, and files stored on the phone. These items were time-stamped. Moreover, he was able to retrieve phone logs and messages from Winn's phone from March 14, 2022, the day of Byest's murder.

¶16. Danilyah testified at length for the State. During her testimony, she testified about her inconsistent statements and testimony.[6] Her first interview occurred on the night of Byest's murder. At that time, Danilyah denied any knowledge of the events surrounding Byest's murder. In June 2023, however, without prompting, Danilyah voluntarily returned to the Humphreys County Sheriff's Department and provided a written statement. Danilyah stated that she was at Santara's house and observed Santara texting Byest "to come outside, that she was fixing to come smoke with [him]."

¶17. At trial, Danilyah was cross-examined regarding her lack of candor and prior

---

[5] The Preliminary Device Report contained thirty-four accounts. At least twenty-one of those accounts included "Jaylen Winn" as either the account or username.

[6] Danilyah testified that she was offered a plea bargain, and part of that plea included her being truthful and honest.

untruthful statements. Danilyah testified that several factors contributed to her decision to withhold information from Investigator Simmons, the officer she spoke to when she voluntarily returned to the police station to provide a statement. These factors included uncertainty about how the victim's family would react and the fact that she was under the influence of Percoset at the time of the initial interview. Danilyah further testified that she stopped using Percoset at the time of the second interview. She explained that she ultimately decided to be truthful after realizing that the investigator already possessed information from her phone, making continued deception unnecessary. Danilyah stated that everything regarding the phone was "right in front of me" and that she believed that it was in her best interest to tell them the full story. She testified that she "was telling the truth now," acknowledged that lying contributed to her current situation of being charged with a crime, and stated that Byest's family deserved closure. After being questioned regarding her truthfulness, Danilyah then recounted the events leading up to Byest's murder on March 14, 2022.

¶18. Danilyah testified that prior to the murder, Byest and Winn had an ongoing disagreement. Before the day of the murder, the disagreement escalated into physical altercations. One altercation was recorded and circulated on social media. Danilyah stated that she viewed the fights on Facebook because they were posted on someone's Facebook page. Danilyah believed that Byest defeated Winn, causing Winn to feel embarrassed, which triggered Winn's motive to murder Byest.

¶19. On the day of the shooting, Danilyah walked to Santara's house around mid-afternoon.

7

Danilyah and Santara smoked marijuana, listened to music, and played with Santara's infant. Winn called Danilyah's cellphone at approximately 8:34 p.m., and they talked for three to four minutes. Danilyah testified that she was still at Santara's residence when the following phone conversation occurred between her and Winn:

Winn:       "Hey, can you do something for me"
**Danilyah:** "What's up"
Winn:       "I need you to get Za'Quawn for me" (Get him to come outside)
**Danilyah:** "No[.]"

¶20.    Danilyah further testified that she declined Winn's request to lure Byest outside, but because Danilyah was talking to Winn through the speakerphone, Santara overheard the conversation.[7] Santara joined the conversation and expressed her willingness to lure Byest outside in exchange for Winn retrieving her gun from Flee, Winn's cousin. Winn and Santara agreed on this exchange. Santara and Winn did not know each other until that night. Danilyah testified, and it was shown by the Facebook messages introduced into evidence as Exhibit S-10, that she provided Winn with Santara's phone number. The messages were between "Kamilla Rain" and "GBG Jay." Danilyah confirmed that her Facebook handle was "Kamilla Rain" and "GBG Jay" was Winn's handle.

¶21.    The evidence showed a series of detailed coordinated communications in the period leading up to the shooting that occurred between Winn and Danilyah with Santara present. Earlier that evening, Winn and Danilyah exchanged Facebook messages and calls reflecting active coordination and plans to meet at a previously disclosed location. Winn stated in the

---

[7] Danilyah testified that her phone was "messed up," requiring her to use speakerphone.

messages to Danilyah that he had called Santara's phone, that he was "making a call for [Santara's] gun now," and that "at 9:45 we going out there," which Santara was informed of because Danilyah was at Santara's house. Danilyah and Santara informed Winn that they were determining Byest's location. During this exchange, Winn also stated, "He coming out," indicating his anticipation of Byest exiting his residence.

¶22.    At the same time, at approximately 8:50 p.m., Santara was text messaging Byest and asked whether he was home and whether he would come outside, under the guise of wanting to smoke, and stated, "Be outside." Around the same time, Danilyah placed a video call to Winn, and he told her that he was in a field, which was consistent with what she saw in his background. Santara continued messaging Byest, to make sure that he was outside, leading him to believe that she was on her way but that it was taking longer than expected to get the marijuana.

¶23.    During the same time, at approximately 8:53 p.m., Winn ("GBG Jay" on Facebook) exchanged Facebook messages with an individual named Qveen Tee-tee. Winn wrote, "Bae I'm finna get his ass" to which she replied, "be safe, I love yhuuu please DON'T GO JAIL . . . ."

¶24.    Byest was shot once in the chest at approximately 9:00 p.m. After the shooting, Winn and Danilyah continued their communications regarding the setup. Winn reminded Danilyah of the story they had created as an alibi for the shooting, saying, "[R]emember what I told you to say," i.e., that she and Winn had been sitting in a car smoking when Byest approached, and a fight occurred; while Winn and Byest were tussling, the gun discharged, leaving Byest

9

shot. Winn expressed to Danilyah his immense gratitude for her if he were to make it out of this ordeal an innocent man. Further, the pair discussed Santara's gun, asking, "[A]nd [Santara] said what about her gun," and Winn replied, "[W]e're getting it," as confirmed by their Facebook messages.

¶25. Danilyah further testified that she witnessed Santara send Byest a text message asking him to come outside so they could smoke marijuana. According to Danilyah, Santara had her cellphone mirroring (i.e., projecting) onto her television, allowing Danilyah to see Santara's messages on the screen. Danilyah stated Santara told Byest that because her phone was disconnected, she could not call him, so she instructed him to be outside looking for her. In addition, Danilyah testified that Santara never went to get any marijuana to smoke and never traveled to Byest's house. Moreover, Danilyah stated that Santara did not own a vehicle or have any available transportation to travel to Byest's house.

¶26. On cross-examination, Danilyah testified that she had pled guilty to second-degree murder, because she conspired to the act by relaying messages, along with her knowledge that Byest would be killed if Santara was able to get him outside.

¶27. Kenny Lewis corroborated the details from the night of the murder, including information from the crime scene and his interrogation of Winn and Miles. Lewis identified inconsistencies in Winn's interview, including Winn's inability to describe the model of the vehicle he claimed to have been in with Danilyah while they were smoking. Winn told Lewis that the vehicle was parked in front of Byest's residence; however, during Danilyah's interview, she stated that she was not at Willow Bend and that she did not own a vehicle.

10

Further, Lewis concluded that Winn was lying to him because the gun at the crime scene did not match the bullet removed from Byest.

¶28. The State rested. Winn moved for a directed verdict. Santara also moved for a directed verdict. The court denied the motions. The defense presented no witnesses and rested its case.

¶29. Winn and Santara were convicted of first-degree murder and conspiracy to commit murder. Danilyah had been indicted with them for first-degree murder and conspiracy to commit murder. However, Danilyah entered a plea deal; she pled guilty to second-degree murder and agreed to testify against Santara and Winn.

## STANDARD OF REVIEW

¶30. When considering a claim of insufficient evidence to support a conviction, "we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lollis v. State*, 373 So. 3d 1004, 1007 (¶12) (Miss. 2023) (quoting *Lenair v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017) (citing *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010))). "The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id*. (quoting *Morgan v. State*, 741 So. 2d 246, 256 (¶28) (Miss. 2019) (quoting *Franklin v. State*, 676 So. 2d 287, 288 (Miss. 1996))).

## DISCUSSION

I. **Whether there is sufficient evidence to support a conviction of conspiracy to commit murder.**

¶31. Winn argues that there was insufficient evidence to support his conviction of

11

conspiracy to commit murder. The State contends that the circumstances surrounding the killing, acts, and conduct of Winn, Danilyah, and Santara provide the evidentiary support for a conspiracy to commit murder.

¶32. Mississippi Code Annotated section 97-1-1 defines conspiracy: "(1) If two (2) or more persons conspire either: (a) [t]o commit a crime; or . . . (h) [t]o accomplish any unlawful purpose, or a lawful purpose by any unlawful means; such persons, and each of them, shall be guilty of a felony . . . ." Miss. Code Ann. § 97-1-1 (Rev. 2020). "[T]he elements of a conspiracy require 'recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose.'" *Lollis*, 373 So. 3d at 1007 (¶11) (quoting *Peoples v. State*, 501 So. 2d 424, 428 (Miss. 1987)). "A conspiracy is a separate, complete offense and the crime is completed once the agreement is formed. . . ." *Id*. (quoting *State v. Thomas*, 645 So. 2d 931, 933 (Miss. 1994) (citing *Norman v. State*, 381 So. 2d 1024, 1028 (Miss. 1980))).

¶33. "The agreement need not be formal or express, but may be inferred from the circumstances, particularly from declarations, acts and conduct of the alleged conspirators." *Lollis*, 373 So. 3d at 1007 (¶13) (quoting *Thomas v. State*, 591 So. 2d 837, 839 (Miss. 1991)). "[O]nce the existence of a conspiracy is shown, only slight evidence is required to connect a particular defendant with the conspiracy." *Id*. (quoting *Morgan*, 741 So. 2d at 256 (¶27)).

¶34. The Mississippi Supreme Court held in *Willis v. State*, 300 So. 3d 999 (Miss. 2020): "[W]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id*. at 1007

(¶25) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).  Further, in *Butler v. State*, 354 So. 3d 308 (Miss. Ct. App. 2022), this Court repeated: "[O]ur authority to disturb the jury's verdict is quite limited." *Id*. at 320 (¶32) (quoting *Clayton v. State*, 652 So. 2d 720, 724 (Miss. 1995)).  This Court has held that "[t]he jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed.  The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity." *Tuggle v. State*, 380 So. 3d 991, 1000 (¶25) (Miss. Ct. App. 2024) (citation omitted) (quoting *Ford v. State*, 737 So. 2d 424, 425 (¶8) (Miss. Ct. App. 1999)).

¶35.   In *Lolli*s, a Wilkinson County jury convicted Lollis, and two codefendants of first-degree murder and conspiracy to commit murder. *Lollis*, 373 So. 3d at 1007 (¶1).  After the trial court denied the defendant Lollis's motion for judgment notwithstanding the verdict, Lollis appealed raising sufficiency of the evidence of both convictions as issues on appeal. *Id*.  The Mississippi Supreme Court held that Lollis's actions were more than enough evidence for a rational trier of fact to find that Lollis and others conspired to murder the victim. *Id*. at 1009 (¶19).  No witness testified to seeing Lollis directly commit the murder; however, there was enough evidence inferred from the surrounding circumstances to establish that Lollis conspired to kill and, in fact, carried out the murder. *Id*. at (¶¶14,16-17).  There was witness testimony connecting the three co-conspirators on the night of the murder. *Id*. at (¶¶14, 19).  A witness observed a gun being pulled out, pointed at the victim, heard the

13

sound of gunshots, and testified that Lollis offered money for someone "to take [the victim] out." *Id*. at (¶¶14,16). The day following the murder, Lollis offered the witnesses $300 to remain quiet about the incident. *Id*. at (¶17). These actions were sufficient for a rational trier of fact to determine that Lollis conspired to commit murder. *Id*. at (¶18).

¶36. In the instant case, the State presented the jury with substantial direct and circumstantial evidence demonstrating coordinated conduct among Winn, Santara, and Danilyah to murder Byest. "[O]nly slight evidence is required to connect a particular defendant with the conspiracy." *Lollis*, 373 So. 3d at 1008 (¶15) (citing *United States v. James*, 528 F.2d 999, 1012 (5th Cir. 1976)). Cellphone forensic records corroborated communications between the three, including text messages from Santara requesting Byest to meet her outside. Moreover, Santara never showed up to Byest's residence. Santara, who was Byest's cousin, leveraged the closeness of that relationship and a fabricated desire to smoke marijuana together as the means to entice Byest to come outside so that Winn could harm him. Additional messages recovered from the phone referenced the return of Santara's gun, which the jury could reasonably infer was the bargaining tool between Winn and Santara. The recovered phone messages also showed communications between Winn and another individual (Qveen Tee-tee), minutes before the murder, where Winn stated that he was about to "get [him]," to which the person cautioned him to not go to jail, suggesting that unlawful activity was imminent.

¶37. After the shooting, digital forensic analysis directly linked Winn to the cellphone, with the Apple ID jaylenwinn0. There were additional recovered messages amongst the three,

14

demonstrating their attempt to create an alibi, with Winn instructing Danilyah to "remember what I told you to say." When questioned, Danilyah said she understood her response should be that they "were tussling and the gun went off." Winn replied to Danilyah that if he avoided consequence, Danilyah had shown true loyalty to him.

¶38. Winn turned himself in and admitted that he was connected to the shooting; however, he stated that he was tussling with Byest, and that during the struggle, Byest's gun fired accidentally. This alibi corroborates the agreed-upon story discussed between Winn and Danilyah. Yet the .45-caliber Glock found at the scene did not match the 9mm bullet recovered from Byest's body. Danilyah further testified to an ongoing disagreement between Byest and Winn that led to physical altercations that were circulated around social media. Lastly, after the shooting and prior to Winn turning himself in, Santara and Danilyah asked Winn about recovering Santara's gun from his cousin. Winn reassured her that he was getting the gun, upholding his end of the deal.

¶39. Based on the foregoing evidence, we hold that there was sufficient evidence for a rational trier of fact to find that Winn was part of the conspiracy to murder Byest.

II. **Whether Winn's trial counsel was constitutionally ineffective by failing to request applicable defense theory instructions.**

¶40. Winn argues that his counsel was ineffective for failing to seek a jury instruction on accidental homicide and misfortune and a cautionary instruction to consider Danilyah's testimony with caution and suspicion. The State argues that the record is not ripe for appeal on this issue and that this Court should dismiss Winn's claim without prejudice to preserve his right to raise the claim in a properly filed motion for post-conviction relief. *See Murray*

15

*v. State*, 345 So. 3d 610, 624 (¶39) (Miss. Ct. App. 2022).

¶41.   In the alternative, the State contends that the record does not affirmatively show ineffectiveness of counsel.  The State argues that Winn cannot meet the required two prong test set out in *Strickland* to succeed on an ineffective assistance of counsel claim because he has not shown that his trial counsel's performance was deficient and that the deficient performance prejudiced him.

¶42.   Ineffective assistance of counsel claims typically are raised in a motion for post-conviction collateral relief "because there is usually insufficient evidence within the record to evaluate the claim."  *Blocton v. State*, 340 So. 3d 384, 393 (¶35) (Miss. Ct. App. 2022).  In *Norwood v. State*, 368 So. 3d 293 (Miss. 2023), the Mississippi Supreme Court stated that "an appellate court is limited on direct appeal to the trial-court record before it, 'and there may be instances in which insufficient evidence and/or information exists within the record to address the claim adequately.'"  *Id*. at 297 (¶21) (quoting *Dartez v. State*, 177 So. 3d 420, 423 (¶18) (Miss. 2015) (citing *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008))).  But we will "address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record."  *Id*. (quoting *Eubanks v. State*, 841 So. 3d 896, 908 (¶34) (Miss. 2022) (quoting *Parker v. State*, 30 So. 3d 1222, 1232 (Miss. 2010))).

¶43.   "Whether a defendant has received ineffective assistance of counsel is a question of law reviewed de novo under two prongs: 'first, the defendant must show that counsel's performance was deficient.  Second, the defendant must show that the deficient performance prejudiced the defense.'"  *Robinson v. State*, 384 So. 3d 505, 510 (¶18) (Miss. 2024) (quoting

*Taylor v. State*, 167 So. 3d 1143, 1146 (¶5) (Miss. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984))). The "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. (quoting *Ransom v. State*, 919 So. 2d 887, 889 (¶12) (Miss. 2005) (citing *Foster v. State*, 687 So. 2d 1124, 1129-30 (Miss. 1996))). "And even where professional error is proven, this Court must determine if there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. at 510-11 (¶19) (quoting *Chamberlin v. State*, 55 So. 3d 1046, 1050 (Miss. 2010) (quoting *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991)).

¶44. In the present case, because the record is clear that Winn's counsel did not request these instructions, though this could arguably be considered trial strategy, this Court will consider the merits of these claims.

¶45. "If warranted by the evidence, it is fundamental that a defendant is entitled to a jury instruction on his theory of the defense." *Odom v. State*, 426 So. 3d 378, 383 (¶11) (Miss. Ct. App. 2025) (quoting *Johnson v. State*, 749 So. 2d 369, 372 (¶10) (Miss. Ct. App. 1999)). However, "a defendant's right to jury instructions that present his theory is not absolute." *Id*. (quoting *Rasheed v. State*, 237 So. 3d 822, 828 (¶15) (Miss. Ct. App. 2017) (quoting *Davis v. State*, 18 So. 3d 842, 847 (¶15) (Miss. 2009))). "A defendant is not entitled to an instruction that is without foundation in the evidence." *Id*. Although Winn claims

entitlement to both instructions, the record contains overwhelming proof to the contrary.

### A. Accident-or-Misfortune Jury Instruction: Excusable Homicide Under Mississippi Code Annotated Section 97-3-17(a)-(b)

¶46. Winn was not entitled to an excusable homicide instruction under Mississippi Code Annotated section 97-3-17(a)-(b) (Rev. 2020) because that instruction was unsupported by the evidentiary record. Moreover, there was significant circumstantial evidence tying Winn to the unlawful act of conspiracy to commit murder. This was our holding in *Anderson v. State*, 359 So. 3d 637 (Miss. 2023), when the defendant claimed that the shooting death of his grandmother was an accident. *Id.* at 639 (¶1). In that case, shortly before the shooting occurred, a witness had heard Anderson and his grandmother "talking loudly" and observed Anderson retrieve an unloaded shotgun from his vehicle, load it, and walk back inside with a demeanor like he was "going to kill someone." *Id.* at (¶3). Around that same time, Anderson's sister heard a gunshot. *Id.* at (¶4). The sister immediately called the grandmother's telephone, and she did not answer. *Id.* The sister then called 911 and reported her observations, including seeing Anderson leave the house carrying a shotgun and concealing it in a crawl space under the house. *Id.*

¶47. Anderson's record also made clear that the evidence supported the fact that he was engaged in significant unlawful acts. *Anderson*, 359 So. 3d at 640, 643 (¶¶10, 24). At trial, Anderson admitted to shooting his grandmother; however, he claimed his grandmother attempted to "snatch the gun" from his hands, and because of that, the gun went off. *Id.* at 640 (¶10). He also admitted that he was high on methamphetamine, he was aware that he was prohibited from possessing a firearm due to a prior felony conviction, he concealed the

weapon, and he fled the scene, all acts that "negat[ed] that he was doing a lawful act." *Id* at. (¶¶8,10-11). Additionally, the medical examiner testified that the wound was inflicted at a close range and ruled that the grandmother's death was a homicide. *Id*. at 641 (¶13).

¶48. Anderson submitted an accident-or-misfortune jury instruction under Mississippi Code Annotated section 97-3-17(a)-(b).[8] *Anderson*, 359 So. 3d at 641 (¶15). The State objected, and the trial court refused it, finding that the submitted instruction was unsupported by the evidence. *Id*. at (¶17).

¶49. On appeal, the defendant argued that under this fact, the trial court erred by refusing an accident-or-misfortune jury instruction. *Id*. at 642 (¶17). Further, he contended that the question of whether he violated the law was a question of fact for the jury to resolve. *Id*. at 641 (¶19). The Mississippi Supreme Court disagreed and held that because Anderson was not engaged in lawful conduct, nor was he exercising ordinary caution at the time of the shooting, there was insufficient evidence to support an excusable homicide or an accident or misfortune instruction. *Id*. at 643 (¶¶24, 27).

¶50. In the case at hand, Winn was likewise not entitled to an accident-or-misfortune jury

---

[8] Mississippi Code Annotated section 97-3-17 provides:

The killing of any human being by the act, procurement, or omission of another shall be excusable:
    (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
    (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
    (c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

instruction because the evidence overwhelmingly established that Winn conspired to commit murder, an unlawful act. As previously discussed above, under section 97-1-1, conspiracy is an unlawful act that occurs "if two (2) or more persons conspire either: (a) to commit a crime; or . . . (h) to accomplish any unlawful purpose, or a lawful purpose by any unlawful means; such persons and each of them, shall be guilty of a felony. . . ." Here, the digital forensics specialist White testified as an expert and said that several messages were found in Winn's phone, demonstrating his active conspiracy with Danilyah and Santara. The messages also showed Winn's attempt to conceal a story from the police and his instructions to a co-conspirator of what the fabricated alibi should be: "remember what I told you to say." He then followed up with messages indicating he was about to meet with the police, and he was hopeful he would get excused from the homicide. Shortly before the shooting, Winn also had messages with another individual that he "was about to get [him]." The overall evidence suggests that "him" was Byest. Further undermining Winn's statement that Byest shot himself with his own gun, a .45-caliber Glock, the forensic scientist Bishop testified as an expert and said that he recovered a 9mm bullet from Byest's body, not a .45-caliber bullet.

¶51. There was substantial evidence showing that Winn was engaged in a conspiracy, an illegal act. This unlawful act would negate Winn from being entitled to an accident-or-misfortune instruction. In addition to this crime, the record provided evidence that would preclude any rational juror from finding Winn's requested excusable homicide instruction applicable. *Smith v. State*, 383 So. 3d 1246, 1252 (¶27) (Miss. Ct. App. 2023). Therefore, Winn was not entitled to an accident-or-misfortune instruction, and counsel's failure to

20

submit this instruction could not be considered deficient.

### B.    Cautionary Jury Instruction

¶52.    Further, we find no merit to Winn's claim that he was entitled to a cautionary jury instruction. A cautionary instruction directs the jury to consider an accomplice's testimony with great caution and suspicion when uncorroborated by other evidence. *See* Mississippi Model Jury Instruction 203. "Although granting a cautionary instruction regarding the testimony of an accomplice is within the trial judge's discretion, such an instruction is required when the accomplice's testimony is the sole basis for the conviction, and the defendant's guilt is not clearly proven." *Warren v. State*, 269 So. 3d 1207, 1209 (¶9) (Miss. Ct. App. 2018) (quoting *Williams v. State*, 32 So. 3d 486, 490 (¶12) (Miss. 2010)). In *Warren*, the defendant was found guilty of committing grand larceny after he and his accomplice stole seven rings valued at approximately $4,500. *Warren*, 269 So. 3d at 1207-08 (¶¶2-3). On appeal, Warren argued that the State's case rested upon the uncorroborated testimony of his accomplice, Woods, and as a result, he should have received a cautionary instruction. *Id.* at 1209 (¶9). This Court disagreed and found that the co-conspirator's testimony was not the sole basis for Warren's conviction. *Id*. at (¶10). Other evidence included testimony tying Warren to the crime, including a witness who overheard Warren mention that the jewelry was stolen, and other testimony placing Warren at the crime scene. *Id*. Because Warren's guilt was proven by other means, a cautionary jury instruction was not required. *Id.* at (¶¶9-10).

¶53.    The same rationale applies to Winn. Here, the State did not solely rely on Danilyah's

testimony. Several others also testified at the trial implicating him in the conspiracy and ultimate murder, including Francis Byest, Frank Peretti, Jamie White, Kenny Lewis, Tommy Bishop, and Milton Byest. Thus, Winn's guilt was clearly proved by other corroborating evidence in the case. Moreover, as we note in our discussion of Winn's first issue on appeal, Winn cannot show prejudice because of the overwhelming weight of the evidence. Accordingly, we find that Winn was not entitled to a cautionary jury instruction.

¶54.    Therefore, we find that Winn's trial counsel's actions were not deficient because Winn was not entitled to the instructions he claimed.

## CONCLUSION

¶55.    For the aforementioned reasons, we affirm the judgment of the trial court.

¶56.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**